# EXHIBIT

# C

```
 1              UNITED STATES DISTRICT COURT FOR THE        1
                   MIDDLE DISTRICT OF FLORIDA
 2                    JACKSONVILLE DIVISION

 3
      BYRON ANDREWS,
 4    DC# B06604,

 5         Plaintiff,

 6
      vs.                      CASE NO. 3:23-cv-88-MMH-JBT
 7
      SGT. CICCONE,
 8
           Defendant.
 9    _____/

10

11

12

13              VIDEO-TELECONFERENCE
                 DEPOSITION OF BYRON ANDREWS
14            (Taken on behalf of the Defendant)

15    DATE TAKEN:      March 26, 2024
      TIME:            2:00 p.m. - 3:25 p.m.
16    PLACE:           Zoom

17

18

19

20

21

22
           Examination of the witness taken before:
23
             JESSICA RENCHEN, Court Reporter
24                    On Behalf of
                 For The Record Reporting
25
```

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

```
 1    APPEARANCES OF COUNSEL:                              2

 2    On behalf of Defendant:

 3    JUANITA VILLALPANDO, ESQ.
      Assistant Attorney General
 4    Florida Bar No.:  1036083
      Office of the Attorney General
 5    The Capitol, Suite PL-01
      Tallahassee, Florida 32399
 6    E-mail:  Juanita.Villalpando@myfloridalegal.com

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

3

```
 1                 INDEX OF WITNESS

 2

 3   WITNESS                              PAGE

 4      BYRON ANDREWS
           Examination by Ms. Villalpando    04
 5
                        ****
 6

 7   CERTIFICATE OF OATH                   54
     REPORTER'S PAGE                       55
     READ & SIGN LETTER                    56
 8   ERRATA SHEET                          57

 9
                        ****
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

4

```
 1               D E P O S I T I O N

 2        THE COURT REPORTER:  Please raise your right

 3   hand.

 4        Do you swear or affirm that the testimony

 5   you're about to give will be the truth, the whole

 6   truth and nothing but the truth?

 7        THE WITNESS:  I do.

 8        THE COURT REPORTER:  Okay.  Thank you.

 9        MS. VILLALPANDO:  All right.  Can we start?

10        THE COURT REPORTER:  Yes, ma'am.  We're on

11   the record.

12        MS. VILLALPANDO:  Thank you.

13                   EXAMINATION

14   BY MS. VILLALPANDO:

15        Q.   All right.  Hello, Mr. Andrews.  I am -- my

16   name is Juanita Villalpando.  I'm the attorney

17   representing the defendant, Defendant Alexander

18   Ciccone, for the Case Number 3:23-cv-88 filed in the

19   Middle District of Florida.

20        I'm gonna be asking you questions about this

21   case.  For starters, can you -- do you mind stating

22   your name and DC number for the record?

23        A.   My name's Byron Andrews; DC Number B06604.

24        Q.   All right.  Where are you currently located?

25        A.   Florida State Prison Main Unit.
```

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

5

1          (Indiscernible background noise.)

2    BY MS. VILLALPANDO:

3        Q.    Okay.  Have you ever been deposed before?

4        A.    No, ma'am.

5        Q.    All right.  I'm gonna go -- I'm gonna quickly

6    go through a couple of preliminary matters.

7          THE COURT REPORTER:  Before we begin, I'm

8    sorry, Mr. Andrews, is there anyone else in the

9    room with you?

10         THE WITNESS:  Yeah, there's someone here

11    signing some papers.

12         THE COURT REPORTER:  Okay.  I was just

13    wondering if there's a door open, if maybe it can

14    be closed.

15         UNKNOWN SPEAKER:  I'll leave as soon as I

16    have him sign this.

17         THE COURT REPORTER:  Okay.  Thank you.

18         MS. VILLALPANDO:  Let's have him do that

19    before we continue.

20         THE COURT REPORTER:  Yes, ma'am.  Thank you.

21    That would be helpful.

22         (Brief pause.)

23         THE WITNESS:  Okay.  I'm alone.

24         THE COURT REPORTER:  Thank you.

25         We're back on the record.

6

1    BY MS. VILLALPANDO:

2        Q.    All right.  So I'm gonna go over a few

3    things.  Please answer all your questions clearly, so

4    the court reporter can record your verbal answers.  No

5    nonverbal nods and stuff like that.  If you don't

6    understand the question, please ask me to rephrase.

7    If you need a break, like to the restroom or

8    something, just tell me and we'll -- we'll take a

9    pause.

10         Objections can be made but cannot be handled

11    right now.  You still must answer the question but you

12    can state if you object to the way it is phrased or

13    object to the content.

14         All right.  Mr. Andrews, are you currently

15    under any medications that would impair your focus or

16    inhibit you from answering today's testimony?

17        A.    No, not at this time.

18        Q.    Do you take medication any other time?

19        A.    I take -- I'm prescribed high blood pressure

20    medication.

21        Q.    Are you currently on it right now?

22        A.    No, not right now.

23        Q.    Okay.  Are you going to be truthful and

24    honest with me today?

25        A.    Yes.

7

1    Q.  Okay.  And after the transcripts are

2 complete, do you want to read the transcript to verify

3 the information or do you waive?

4    A.  What do you -- what do you mean?  Would you

5 mail the transcripts to me?

6    Q.  So we do not provide you a -- we provide --

7 we can provide you with a copy to review.  However,

8 you do not get to keep a copy of the transcript.  All

9 you can do is fill out an errata sheet if you see any

10 mistakes regarding your testimony, and -- and it has

11 to be minor mistakes, like you said he instead of she.

12 And I guess to answer your question, whether we send

13 you one, no.  If you want to purchase one, we can give

14 you the information of the court reporter and you can

15 request one from her.  You'll be able to view one.

16    A.  So how would I view it?

17    Q.  We will send you one to review; you do not

18 get to keep it, though.

19    A.  I have to send it back?

20    Q.  Yes.

21    A.  Okay.  So yeah, I want to review it.

22    Q.  Okay.  This case involves allegations

23 pertaining to your incarceration stemming from the

24 alleged abuse by another inmate, correct?

25    A.  Yes.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

8

1    Q.  All right.  Some background questions:  What

2 crimes are you currently in prison for?

3    A.  Occupied burglary.

4    Q.  Okay.  How long have you been in FDC custody?

5    A.  2019.

6    Q.  When are you due to be released?

7    A.  My release date as of right now is 2046.

8    Q.  Is it your first time in FDC custody?

9    A.  No.

10    Q.  What other convictions do you have?

11    A.  Can you repeat the question?

12    Q.  How many other convictions?  Like, how many

13 times have you been in prison?

14    A.  I've been in prison two other times.

15    Q.  What -- what was the reason for the other

16 times?

17    A.  The previous time before this was also a

18 burglary.  And the time before that was an armed

19 robbery.

20    Q.  All right.  Do you have any chronic medical

21 issues?

22    A.  No.

23    Q.  Do you have any mental issues that you

24 receive treatment for?

25    A.  No.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

9

```
1      Q.   All right.  Now we're gonna talk about the
2  events that transpired and resulted in you filing the
3  complaint report.
4           Can you give me the date the incidents you
5  allege in your complaint occurred?
6      A.   May 16, 2021.
7      Q.   Where did this occur?
8      A.   Columbia Annex inside the N dorm confinement.
9      Q.   What do you mean "confinement"?
10      A.   Confinement units.  You have -- you receive a
11  disciplinary action and you're confined into a cell
12  for 24 -- 24 hours a day -- or 23 hours a day.  It's a
13  disciplinary unit.
14      Q.   Can you describe the defendant, Alexander
15  Ciccone?  What does he look like?
16      A.   Medium height, probably my height, a little
17  heavyset.  I would guess off appearance, I would say
18  he's Italian, how he look, his name.  I remember he
19  had a distinct discoloration of his hair color of a
20  patch in his head.  It was slightly off color, light
21  gray, maybe a birthmark or something.  Pretty much.
22      Q.   Let's see.  So was he white?
23      A.   Well, he had -- his skin was not -- was not
24  dark as mine.  He was -- like I said, I guess his race
25  is Italian.  But I won't call him white.  I call him
```

10

```
1  Italian.
2      Q.   Okay.  What was the color of his hair.
3      A.   Say black.
4      Q.   Black.
5           And you said it had a discoloration?
6      A.   Yes.  I believe so, if I'm not mistaken.  I
7  can remember it having a discoloration.  Like, a patch
8  in his head had a -- just like grayish, if I'm not
9  mistaken.
10      Q.   And you said, "medium height."  Is that --
11  can you give me like a range?  Like 5 feet?
12      A.   Between 5'10" and 6 feet.
13      Q.   All right.  Prior to the date of May 16,
14  2021, did you have any interactions with the
15  defendant?
16      A.   No, not really.  I've seen him on my previous
17  -- on a previous occasion when I was placed in
18  confinement.  He was a dorm supervisor or sergeant at
19  the time, so he worked -- he worked -- that -- that
20  was his regular unit that he work.  So anytime I would
21  come to confinement, I would see him.  He escorted to
22  the shower, serve trays.  If I needed to be taken out
23  of the cell for any reason, him or another officer
24  would escort me to the place I needed to go to.
25      Q.   All right.  Did you have any negative
```

11

1    interactions with the defendant?

2        A.    No, ma'am.

3        Q.    Did you have any interactions with Defendant

4    Ciccone after the incident, after May 16th?

5        A.    No, I don't recall.  So I think I may have

6    seen him working inside of the dorm, but I don't think

7    I had any -- any interaction with him at that.  I was

8    released 10 days after the incident occurred.  May

9    25th I was -- I was released from confinement.

10       Q.    Does that mean that you were transferred to

11   another dorm?

12       A.    Yes, I was transferred to another dorm.

13       Q.    All right.  Okay.  Can you tell me -- can you

14   describe in detail the interaction between you and the

15   defendant on May 16th?

16       A.    Well, yes.  I was placed inside to the cell

17   with him.  I believe it Cell 4213.

18       Q.    Sorry, I'm gonna stop.  I'm gonna stop.  When

19   I said "defendant," I'm talking about --

20       A.    Oh, you mean -- you mean -- oh, Ciccone.

21       Q.    Yes.  I'm only -- right now I'm only talking

22   about the officer -- sergeant.

23       A.    Okay.  So what was the question again?

24       Q.    Can you please describe in detail the

25   interaction between you and Sergeant Ciccone?

12

1        A.    When I was escorted to the confinement unit,

2    the procedure is I was placed inside of a holding

3    cell.  And while I was inside the holding cell waiting

4    to be classified, he came and asked me questions:  My

5    name, which dorm I was from, those type of questions,

6    and told me I'll be -- I will be placed in a cell

7    shortly, that I had to be classified and then I'll and

8    I'll be escorted to a cell.

9        Q.    Do you know what that means, to be

10   classified?  Can you elaborate?

11       A.    You have to be classified is to be screened,

12   evalu- -- gets evaluated and compare with a cellmate

13   that is comparable with you in terms of the amount of

14   time that you have, weight, height.  I'm not sure all

15   what it's based on, but you have to be placed inside

16   of a cell with someone that's comparable to you.

17       Q.    Okay.  And you started off by saying that you

18   were escorted to the confinement unit.  Why were you

19   being escorted here?

20       A.    Why was I being escorted to the confinement

21   unit?  Well, I was -- I received a disciplinary action

22   for knocking on a glass window of the dormitory.  At

23   the time I was trying to alert the officer's

24   attention.  I was having a medical issue and the

25   intercom system inside of the unit -- because the

13

1    officer is inside of a bubble outside of the unit.
2    He's not inside of it.  So I was trying to get his
3    attention and the intercom system that was in our
4    unit, I can't remember exactly which dorm, but it
5    wasn't working.  So it was normal for all the inmates,
6    if you wanted to get the officer's attention, to
7    either wave or you knock on the glass.  So I was
8    knocking on the glass and I was trying to get his
9    attention, and he didn't respond to me.
10          So shortly afterwards, it was -- it was
11   announced that it was count time and all the inmates
12   are to return to they cell.  So I returned to my cell
13   and while count was in progress, another officer came
14   and asked me to submit to hand restraints, which I
15   complied, and I was taken to confinement, which is --
16   which is unusual.  It's really abnormal to be taken to
17   confinement while count is in progress.
18          This is a serious infraction of the rules and
19   regulations to Chapter 33.  During count time, all
20   inmates are to be inside of their cell.  And while
21   count was in progress, I was taken and escorted to
22   confinement.  And the disciplinary action was, I
23   believe, causing a disturbance or disobeying verbal
24   orders or some made up something that they just put on
25   the paper.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

14

1    Q.   Okay.  And you said -- sorry.
2         Were you convicted of the DR?
3    A.   I believe I received probation.  Or I
4    received probation or that was dismissed.  I can't
5    remember.  But when I went to DR court, disciplinary
6    court, I was released from confinement that day.
7    Q.   Okay.  So you don't know if you were
8    convicted or not?
9    A.   Not sure.
10   Q.   That's fine.
11        So you were in the holding cell waiting to be
12   classified.  And what happens next?
13   A.   Sometime after that, officer -- Sergeant
14   Ciccone takes me out of the holding cell and escorts
15   me to -- to Quad 4 of N Dorm, which was upstairs.  He
16   escorted me to Cell 4213 and placed me inside the cell
17   with Inmate Angel Herrera (phonetic).
18   Q.   Did you know the other inmate, Angel Herrera
19   before this -- before this day?
20   A.   I knew of him.  I knew of him from the
21   compound.  Never really had any interaction with him.
22   I knew he was -- I knew he was a homosexual.  I knew
23   he had a reputation of -- of taking contracts out on
24   other inmates or taking what we call hits.  I actually
25   seen him perform -- I actually seen him stab an inmate

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

15

1    at Columbia Annex before.  So he had a reputation of

2    being violent towards other inmates and taking out

3    contracts on them.

4        Q.   Um, can you describe Angel Herrera, what he

5    looks like?

6        A.   Hispanic, I'd say slightly shorter than I am.

7    I'm 5'11", so he would be probably somewhere between

8    5'8" and 5'10".  Medium built, older.  I'd say early

9    50s.  I believe he wore glasses.

10       Q.   So he places you in this -- so he -- the

11   defendant, Sergeant Ciccone, he escorts you to the

12   cell and then what happens?

13       A.   Well, at the time I believe, which I'm not

14   sure because inmates will often say -- will try to

15   divert other inmates from coming inside of their cell.

16   So I believe he said something to the magnitude of,

17   oh, I'm gonna see him or maybe it was I'm under

18   investigation.  It was something to that effect to

19   where he was trying to say, well, I'm not supposed to

20   have a roommate, a cellmate.

21            And at the time, like I said, I wasn't

22   exactly sure because he was behind the door and I was

23   being placed inside.  But it wasn't -- it wasn't a

24   comment that I took serious.  I thought it was some

25   kind of a joke or him just trying to avoid having a

16

1    cellmate because Sergeant Ciccone respond about

2    shrugging his shoulders and saying something to the

3    magnitude, I don't care or that's not my problem in

4    some kind of joking manner and then he put me inside

5    -- he placed me inside of the cell with him.

6        Q.   So you didn't take it -- you didn't take

7    Angel Herrera's comment seriously?

8        A.   No, because I was -- I was aware that -- if

9    he -- if he was on CM 1 or under investigation, I

10   would not be allowed in that cell with him.  So by the

11   fact that I was placed in the cell with him, it

12   discounted any -- discredited any possibility of him

13   being on CM 1 or under investigation or -- or

14   whatever.

15       Q.   Did you tell the sergeant that you didn't

16   want to be housed with Angel Herrera at this moment?

17       A.   Did I say that?

18       Q.   Yeah.  Did you tell him?

19       A.   No, I don't -- I don't believe saying that.

20   I believe, as I recall, he may have asked me -- I

21   don't know if it was him or Angel -- I know it came up

22   about him being a homosexual.  I don't know if it was

23   me who asked him or said -- maybe I commented that he

24   is -- he -- he's gay, he's a homosexual.  I know that

25   came -- that came up.  I'm not sure what -- well, I'm

17

1    not actually sure if that was before or after I was

2    placed inside of the cell.

3        Q.   Yes, but did you -- did you tell the

4    defendant that you don't want to be placed in the same

5    cell?

6        A.   No, I didn't -- I didn't object to it.  I had

7    no reason to.

8        Q.   Okay.  And around what time did this occur?

9        A.   When I was I believe -- okay.  I was taken to

10   confinement around seven o'clock.  This was after

11   count time, so it was around 6:00 or 7:00.  So it was

12   between the hours of 7:00 p.m. and -- between seven

13   and 10 o'clock p.m.  Count time is at 10:00, so it was

14   between seven and 10 o'clock p.m.

15       Q.   Okay.  So you're placed in the cell and then

16   what happens?

17       A.   Well, the first thing I remember we was

18   discussing, and I think that's when it came up, the

19   issue of whether him being a homosexual.  Which I knew

20   he was a homosexual, but I made it clear that I was

21   not a homosexual and to -- and was we gonna have --

22   was that gonna be an issue.  I was trying to -- and

23   from what I -- from what he told me was that he

24   respected the fact that I was not a homosexual.

25       Q.   Okay.  And then what happened next?

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

18

1        A.   Well, we had -- we had discussed -- we was

2    talking, asking questions back and forth and from what

3    I recall, like the -- the vibe was kind of off.  It

4    was -- it was -- it was something unsaid.  I guess he

5    was trying to fill me out to see what type of person I

6    -- because he was -- he was asking questions but he

7    was being -- he wasn't -- he was being elusive and not

8    responding.  It's kind of -- the vibe was kind of off.

9    It was kind of -- it was kind of an awkward situation.

10       He really didn't say too much.  I was just --

11   It was kind of -- it was kind of tense.  It was --

12   wouldn't say tense, but it was -- it was awkward; it

13   was uncomfortable.

14       Q.   Okay.  And what happened next?

15       A.   Well, after that I went -- I went to sleep.

16   I had -- I had -- how are cell is arranged is --

17   there's no bunks.  It's what we call a slab, two slabs

18   of concrete on each side of the room.  One to the far

19   side where the door is is where I slept.  And another

20   one to the other side where the toilet and sink is.

21       So sometime in the middle of the night, I'm

22   not sure the time, but he wakes me up by tapping my

23   bunk.  He -- he taps my bunk and I wake up and I look

24   at him.  And he's standing over me with a -- with a

25   shank, with a homemade knife, which we refer to as a

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

19

1    poker.  It's like a -- it's like a -- a long, thin,
2    hard piece of metal sharpened at the end.  And when I
3    look at him, he tells me -- he tells me -- well, I get
4    -- I sit up in my bunk and he tells me not to move,
5    don't say nothing or I'm gonna hit you, referring to
6    like he's gonna hit me, he's gonna poke me.
7         And he tells me to lay -- he tells me to lay
8    back down.  And once I lay back down, he takes the
9    pillow -- I lay down.  He tells me to lay down on my
10   stomach.  And then he takes the pillow and he places
11   it over my head and tells me not to move and if I
12   move, he's gonna hit me.  So in that situation, I know
13   it can easily escalate and turn life threatening
14   because he's -- he has a weapon.
15        And like I said, I've seen this guy actually
16   stab someone before in the same compound, and I'm
17   thinking if I make a move to try to grab the weapon or
18   take it from him, that he wasn't -- he might -- he may
19   -- he gonna end up stabbing me.  I have no doubt in my
20   mind that he's gonna end up stabbing me.  But I'm
21   concerned what -- what happened from there because I
22   know he's gonna not -- he's not gonna let me disarm
23   him.  He's gonna keep trying to stab me and what
24   happens if I -- if I do get the weapon from him, if I
25   do disarm him?  What then do I got?  Well, I'm gonna

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

20

1    have to stab him.
2         I have a 30-year sentence.  This gentleman, I
3    believe, has a life sentence.  So it was a situation
4    to where, you know, it could end really badly no
5    matter what I do.  If I try to make a move to try to
6    defend myself and try to disarm, either he can end up
7    killing me or stabbing me, seriously injuring me, or I
8    could end up taking a weapon from him and may have --
9    may have to stab him or end up killing him and not a
10   situation was going that I wanted -- I wanted to end
11   up, so I complied with what he said.
12        I laid down and he placed a pillow over my
13   head and he pulled my pants down below my waist.  He
14   kept repeating telling me "Don't move.  Don't move.
15   Don't say nothing.  I'm gonna stab you."  And then he
16   proceeded to assault me.  I can remember him -- I can
17   remember feeling some -- some moisture being applied,
18   which I believe he spitted -- he was spitting
19   (inaudible) on his penis (inaudible) between --
20   between my butt and he proceeded to penetrate me.  He
21   assaulted me, lasted for probably, I'd say, maybe 5 to
22   10 minutes.
23        And then -- and then afterwards, he told me
24   that I'm lucky that he didn't stab me because he -- he
25   commented that he was -- he was -- he was supposed to

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

21

1  hit, indicating that I was put in a cell with the
2  purpose of him to stab me or to assault me in some
3  kind of way. But he said I was lucky that's all the
4  he done to me because he was suppose to hit me or he
5  should've hit me. He said he was supposed to.
6      And like I said, I've never had any type of
7  interaction with this guy. Me and him are -- we just
8  in different circles. He's older. He's older,
9  Hispanic. I'm young, black. He's gay. I'm not. I
10 never probably said more than a few words to him, like
11 how you doing or -- never had any really -- really
12 real interaction with him.
13     Q.   To clarify, you said, Herrera told you that
14 you were put in his cell for the purpose of stabbing?
15     A.   He -- he indicated that when he said that I'm
16 lucky that's all that he -- that he did because he was
17 supposed to stab me. He said he was -- I was supposed
18 to get hit, he said.
19     Q.   Do you know why?
20     A.   Well -- and my -- my best -- my -- well, the
21 reason why I believe so is for the past grievances
22 that I filed against correction officers, mainly one
23 with I filed a grievance against Officer J. Manley
24 (phonetic) for the assault of an inmate who was having
25 a seizure. The inmate was having a seizure inside of

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

22

1  his cell and the officer came in there and responded,
2  told him to stop resisting or comply with and he
3  gassed him. He sprayed him and he proceeded to beat
4  him.
5      The unit was placed there; everyone was told
6  to go to their cell. And while this was taking place,
7  you can hear the guy screaming for help. It was
8  pretty bad. It was pretty dramatic. I felt really
9  uncomfortable.
10     Q.   So you filed a grievance against him?
11     A.   Yes, I did. And I also placed a call into
12 the tip hotline against him.
13     Q.   When did this occur?
14     A.   This occurred say around March, same year,
15 shortly before the incident took place.
16     Q.   Okay. And the grievance was not against the
17 defendant, right, Defendant Ciccone?
18     A.   No, it was not against Ciccone. But after --
19 after the filing of the grievance, I receive threats.
20 Well, I received threats prior to the incident and
21 afterwards. I received threats from the officer who
22 placed me -- who wrote a disciplinary report, Sergeant
23 Tucker, who placed me in confinement, and I was trying
24 to -- when I was trying to get his attention. He will
25 often make comments about whoever filed a grievance,

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

23

1  they don't work.  They're not going to do nothing.
2  There's nothing -- nothing's going to happen behind
3  them and --
4      Q.   Did -- did Sergeant Ciccone ever threaten
5  you?
6      A.   No.
7      Q.   Okay.
8      A.   I never had any contact with Sergeant
9  Ciccone.
10      Q.   So back to Angel Herrera.  So you said it
11  occurred -- that it took 5, 10 minutes?
12      A.   Yes, around that time.
13      Q.   Okay.  And what happened next after he
14  finished?
15      A.   I sat there laying in my bunk for a while
16  until breakfast was served.  Breakfast was served
17  between the hours of like anywhere between 4:00 or
18  5:00, when it's still dark outside.  So after
19  breakfast was served, I --
20      Q.   You mean serve, do they bring it to the cell?
21      A.   Yeah.  This is the confinement unit so the
22  breakfast, the trays -- you're in the cell 24 hours a
23  day so the trays come to you.
24      Q.   Okay.
25      A.   So after breakfast was served, I was -- the

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

24

1  time when they change shifts is around this time in
2  the morning.  Sometimes like seven or eight o'clock.
3  So I was waiting for the next shift to come in to say
4  something about it, because I felt that because of --
5  because of -- because of Angel's comment about I was
6  -- he was supposed to hit me and because of the reason
7  why and how I was placed in confinement led me to the
8  conclusion that this was prearranged.  And the fact
9  that he was in possession of a weapon led me to
10  believe and conclude that the officers were -- had
11  arranged for this situation.  So I did not want to say
12  anything while that shift was still on.  I wanted to
13  wait till the next shift.
14          Sometime between that -- but see -- well, now
15  it's different.  The work schedule was different.  The
16  officers worked eight-hour shifts.  But at that time,
17  they was -- they was working 12-hour shifts.
18      Q.   Okay.
19      A.   Now it's different.  So at that time, I was
20  waiting for different shift to come on to report it.
21  And sometime between then, Sergeant Ciccone comes back
22  to the cell after breakfast is served and he places
23  some personal food items of his and he gives it to
24  Angel Herrera and kind of nods at him and winks.
25          I'm like -- I'm in my bunk that's close to

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

25

1    the cell door, so I'm still -- I'm laying there.  And
2    he places it inside of the cell or whatever, and he
3    takes -- and this is -- again, this is against Chapter
4    33.  This is against the rules of regulations.  I can
5    only assume and conclude that that was paid off for --
6    for the assault.
7        Q.   What did Defendant Ciccone leave behind?
8        A.   It was in a plastic bag.  I believe -- I
9    think, yeah, it was in a plastic bag.  And it was --
10   it was some food items.  It was --
11       Q.   What kind of food items?
12       A.   Not the stuff that we -- we regularly -- we
13   normally receive on canteen.  It was somewhat similar
14   to that.  I remember seeing -- and if I'm not
15   mistaken, I remember seeing a Texas cinnamon roll or
16   something like that and that does not come off the
17   canteen.  It -- it is in the vending -- it is -- that
18   item is inside the vending machine in the visitation
19   area.  Like if you go to visitation, you could get
20   this item out the vending machine.  But it's not
21   served on canteen.  And it was a couple of other items
22   that was like junk food, snack items, stuff like that.
23       Q.   And was this after breakfast had been served?
24       A.   This was after breakfast had been served,
25   yes.

26

1        Q.   How did the defendant drop off the items?
2        A.   When you open the flap door, we have a flap
3    so once you open the flaps and you slide the trays
4    inside --
5        Q.   Uh-huh.
6        A.   -- so he reopened the flap and he placed
7    those items inside of the cell.
8        Q.   And around what time was -- did this occur?
9        A.   It was still dark outside and we are served
10   breakfast in a confinement unit.  It varies.  It can
11   be early as four o'clock.  It can be as late as 7:00
12   or maybe 8:00, but this was after breakfast.  So it
13   could have been later.  It could have been between
14   eight o'clock -- it was close to when it was time for
15   the shift to change.
16       Q.   All right.  Did Angel Herrera say anything to
17   you?
18       A.   At that point?
19       Q.   After the sexual assault.
20       A.   Like, all he told me was I'm lucky that that
21   -- that's all he did, and that he was supposed to hit
22   me and that's it.
23       Q.   All right.  And then what happened next?
24       A.   Well --
25       Q.   Let me -- let me rephrase that.

27

1          Were you in pain?

2     A.   Was I in pain?

3     Q.   Uh-huh.

4     A.   Physically?  Well, physically, yes, I was a

5  -- I felt irritation.  I felt discomfort.

6          Emotionally, I was -- I was -- I was --

7  psychologically, I was in shock.  I was still trying

8  to figure out why he did this, and I was trying to put

9  the pieces together for everything that transpired

10 leading up to the assault and contemplating what

11 should I do, who should I tell, when should I tell.

12 Should I say something to the -- if I say something to

13 the wrong person, I may end up being further

14 retaliated against.  I was -- I was not in a good

15 place after that.

16    Q.   Did you have any physical injuries as a

17 result of the sexual assault?

18    A.   Yes, my anal area was -- it was irritated.  I

19 could feel that it had been -- had been ripped; it had

20 been torn.  I -- obviously, I couldn't view it, but I

21 remember taking toilet paper and wiping my anal and I

22 remember seeing blood on it.  The toilet paper had

23 some blood and it was smeared on it.

24    Q.   Are any of your injuries still ongoing to

25 this day?

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

28

1     A.   Ell, emotionally and psychologically, yes.

2     Q.   But not physically?

3     A.   Not physically.

4     Q.   All right.  Did you get treatment for your

5  injuries immediately after?

6     A.   Immediately after?

7     Q.   Or the same day?

8     A.   I didn't get immediately any treatment the

9  same day.  I reported it, but I reported it to the

10 next shift.  I reported it to Officer Willis.  And I

11 was waiting for the next shift to come in and I

12 believe I may have dozed off because I stayed up the

13 rest of that morning.  I was waiting for the next

14 shift, so.  But I remember Officer Willis, before I

15 could say anything, he came up to my room and told me

16 to submit to hand restraints.  He told me I was being

17 moved to another cell.

18          At that time, as I was being exported --

19 transported from that cell, I was moved to another

20 unit.  I reported it to Officer Willis that -- that --

21 that I had been assaulted; I'd been sexually

22 assaulted.  And he looked at me and distinctly and

23 told me, "If I was you, I wouldn't say nothing about

24 it."  Then he placed me inside of another cell in

25 another unit.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1    Q.    Okay.  Did you report it?

2    A.    What?  To Officer Willis?

3    Q.    To anyone else besides Officer Willis?

4    A.    Yes, I reported it to Captain Cooper when he

5    came to my door.

6    Q.    And when did this occur?

7    A.    This occurred -- this occurred -- I'm not

8    sure if it was that same day, on the 17th, or the day

9    after.  It was between -- it was between the 17th and

10   the 19th or 20 and those days leading right after

11   that.  So I was -- I was in Cell 1103, I believe, if

12   I'm not mistaken, and I was placed inside another cell

13   with a roommate who had been assaulted by officers.

14          This inmate was -- had blood stains on him.

15   He was reporting -- he was constantly, continually

16   yelling out the door that he wants medical attention.

17   Q.    Mr. Andrews, please, let's focus on the

18   questions.

19   A.    Okay.

20   Q.    I asked you when you reported this to -- who

21   did you say?  Krueger?

22   A.    Captain Cooper.

23   Q.    So you said the same day or the days after?

24   Can you clarify?

25   A.    Yeah.  It was between the 17th, the 18th and

1    the 19th, I reported it several times.

2    Q.    To who?

3    A.    The only name of the officer I can remember

4    was Captain Cooper.  But I re- -- I -- after I said --

5    after I reported it to Officer Willis and he told me,

6    "I wouldn't say nothing if I was you," I was -- I was

7    kind of -- I was intimidated.  I was -- felt a little

8    threatened, so I was being careful who I was reporting

9    it to.  I was trying to report to someone who I felt

10   safe to report it to.

11          So when I seen Captain Cooper, I felt he's a

12   supervisor, he had on a white shirt, I reported it to

13   him.

14   Q.    All right.  And what happened after?

15   A.    After I reported it to him?

16   Q.    Uh-huh, yes.

17   A.    Well, when I reported it to him, this was at

18   the time when my cellmate was at the door talking to

19   him asking for medical attention.  And I told him that

20   I wanted to report a PREA.  I have a PREA allegation,

21   I told him something had happened to me and I want a

22   witness statement.  He -- well, as I said -- when I

23   said this to him, he was talking to my cellmate and

24   the discussion was -- between them was that he went

25   back on the deal that they had --

31

1    Q.    Okay.  Mr. --

2    A.    This -- this relates -- this relates exactly

3    -- this is directly to the question you asked.  When

4    he -- when I -- at the time that I said this to him,

5    he responded by saying if I say something about it,

6    the same thing will happen to me, referring to the

7    assault of my cellmate.  And when I reported it, this

8    was while he was discussing it with him.

9         So when I said it to him, when I reported it,

10   he said if I say something about it, the same thing is

11   going to happen to me.  And like I said, this man was

12   covered in blood from an assault by officers the

13   previous day on the same shift.

14   Q.    All right.  So did you ever report it?

15   A.    I reported it to Captain Cooper.

16   Q.    But after Captain Krueger [sic], who did you

17   report it to?

18   A.    I reported it to Officer Willis.  I reported

19   it to Captain Cooper.  I've mentioned it to other

20   officers that I can't remember names because it was --

21   Q.    So after you -- after your discussion with

22   Captain Krueger [sic], did you discuss it with other

23   --

24   A.    Cooper, Cooper.

25   Q.    Cooper?

32

1    A.    Yes, C-o-o-p-e-r, Captain Cooper.

2    Q.    After that discussion with Captain Cooper,

3    did you report it to any other officer?

4    A.    While in confinement?

5    Q.    At anytime.

6    A.    At anytime?  Yes, after I was released from

7    confinement, I reported it to several officers.  I

8    reported it to the mental health counselor named Mr.

9    Stirley (phonetic), a big, heavyset black dude.  I

10   went up directly to medical and asked to speak with a

11   counselor.  I reported it to him.  I reported it to --

12   I can't remember officers' names because it was -- it

13   was so long ago.

14   Q.    When were you -- backtrack a little bit.

15   When were you released from confinement?

16   A.    25th.

17   Q.    Of?

18   A.    May.

19   Q.    May.  So May 25th you were released?

20   A.    Uh-huh.

21   Q.    Did you file any grievances about this

22   incident?

23   A.    Yes.  When I -- when I learned that Angel

24   Herrera was in fact, actually approved for CM 1 and he

25   was placed on CM 1 as of the time, I filed a grievance

33

1   against Sergeant Ciccone for placing me inside of a
2   cell with someone who was on CM 1, that placed me in
3   danger.
4           I didn't mention the assault in it because
5   Chapter 33, you're not supposed to raise multiple
6   issues on a grievance.  I tried to call the tip
7   hotline, the phone service wasn't working.  I filed a
8   grievance on that, but the phone system's not allowing
9   me to dial out to the -- the -- the hotline.  And the
10  other officers I reported it to never gave me a
11  response, told me that the grievance don't work and
12  basically keep quiet, don't say nothing about it.
13  So --
14      Q.   Which officers?
15      A.   It was the officer that was working at where
16  the grievance box that you place the grievances in.
17  It's at the center gate.  It's not inside the unit.
18  So this is after I got released from confinement.
19          When I went in to turn in the grievance, I
20  put it inside the griev- -- the officer that was
21  working -- okay, yeah.  I would have to check the
22  dates on my grievances because I keep them.  But I
23  believe it was like the 25th or the 26th, I wrote
24  several grievances.
25      Q.   The 25th or the 26th of which month?

34

1      A.   It can be after May or June.  But this was
2   the formal grievance.  So it takes -- the grievance
3   process, you have to wait for your time to expire
4   before you can appeal it.  So on the 25th or 26th
5   either May or June, this was after I had filed the
6   informal grievance.
7           And this grievance was relating to the
8   incident -- the situation that occurred the same day
9   with Sergeant Tucker, the one who wrote me the
10  disciplinary report.  I filed a grievance on him for
11  the false disciplinary report, for denying me medical
12  when I was trying to -- I was telling him I was
13  feeling lightheaded and also, yeah, when I -- the
14  disciplinary report that I received to go to
15  confinement, I was placed -- when I -- when I -- hold
16  on.
17      Q.   Sir, I'm only asking about grievances
18  regarding after the incident that are related to the
19  incident.
20      A.   Grievances that are related to the incident.
21  This --
22      Q.   (Inaudible) --
23      A.   -- this directly relates to it.  It was while
24  I was placed in confinement.  This was the reason --
25  the grievance is the reason why I was placed in

confinement. So I filed those grievances, filed in confinement.

Q. So you were able to file grievances while you were in confinement?

A. Yeah. I filed grievances in confinement. A lot of them never was returned. Had plenty of issue with the grievances not being returned or not being responded to.

Q. So you're -- you're saying that you're -- that all your grievances were not responded to or just some of them?

A. Some of them.

Q. All right.

A. The ones that I filed prior to coming to confinement, the reason for why I was placed in confinement, for the disorderly conduct -- that's what it was, for disorderly conduct -- those were responded -- after I got out of confinement, I received a response to them. And I believe the day is like -- it had to be June because it's 15 days, so I was appealing it. And I have the appealed grievance. I have the (inaudible) date on them.

When I was appealing it, I went to the center gate -- you can -- you can cross-reference this against -- I guess you can call references to see who





was working center gate because they would keep a log for that day. I said to the officer, "Man, hey, I've been trying to file for a PREA." "Nah, man." And while I was in confinement. And the officer told me, "those grievance don't work" and "no one's gonna do anything about it." And he laughed at me. He laughed at me.

So again, I tried the tip hotline several times. It was not -- it was not working, so I went down to -- I went down to medical. I reported it to the mental health counselor, Mr. Stirley. I believe this was like June 22nd.

Q. Okay. Did you -- but did you eventually ever file a PREA complaint?

A. Yes. After several -- after not having several grievances responded to, after not being able to dial out to the tip hotline, I wrote a handwritten letter to the grievance board in Tallahassee. I was able to get the information from someone because I wasn't -- I never -- I never had -- I never made a PREA assault -- I mean, I've never made a PREA allegation. I never -- I was not sure how the procedure works.

Even though this is my third time in prison, the first time I was in prison, I did roughly six

37

1    months and the second time, I did a year.  I'd never
2    been in prison any long stretch of time prior to this,
3    so I was not familiar with the -- I didn't even know
4    what PREA was.
5           So I wrote to the grievance coordinator in
6    Tallahassee and I explained that, hey, I'd been
7    sexually assaulted.  I explained that I've been trying
8    to report this for some time.  I reported that the
9    phone system doesn't work, doesn't allow me to dial
10   out to the tip hotline, and I reported that I -- I
11   stated that I reported this to the mental health
12   counselor and I had received no response; and
13   therefore, I was placing it in writing and reporting
14   it to -- to -- to -- the name I received was Becky
15   Gates (phonetic).  I don't know if that was the
16   grievance coordinator at the time, but that's the
17   information that I received and that's who I wrote the
18   report to.
19        Q.   Okay.  And what happened as a result of the
20   PREA investigation?
21        A.   Okay.  So on July 8th, I wrote -- I wrote --
22   I wrote the -- I reported sometime before the July 4th
23   holiday weekend.  It was over a weekend.  So I wrote
24   it before that, probably like a week before.  And it
25   got reported on the 8th.  It got reported on the 8th.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

38

1           So on the 8th of July, officer came to my
2    unit and placed me in handcuffs and escorted me down
3    to the captain's office.  And when I spoke to Captain
4    -- I believe Captain Camacho or Comacho, something
5    like that, he asked me -- it was like -- had to be
6    over 10 correctional officers in the captain's office.
7    I was in handcuffs.  Went to yelling at me, asking me
8    "why didn't I report it to them?  Why did I go to
9    Tallahassee?"  And I told them, "I had reported it to
10   several officers, including Captain Cooper, including
11   the mental health counselor, including Officer
12   Willis."  Explained that the phone service doesn't
13   work and that that's who I reported it and in writing.
14          And then I was told -- well, he asked me a
15   few questions about do I remember what cell it
16   happened in?  I said, "Yes, 4213."  He showed me a
17   picture of Angel Herrera and asked me to identify who
18   was that.  I said, "Yeah, that's him."  He showed me a
19   picture of him on a computer, on a monitor.  I said,
20   "Yeah."
21          And then he asked me to describe what
22   happened and all this.  And I told him, "I do not feel
23   comfortable with speaking to a correctional officer
24   about the assault because I believe correctional
25   officers was involved in the assault."  And I stated

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

39

1    -- I specifically specified several times that I want
2    to speak to a PREA investigator. And he told me that
3    I will not be able to speak to a PREA at that -- he
4    told me that how it works, I have to first explain to
5    him what happened and then he deems it as necessary
6    and if I should speak to a PREA investigator. And
7    because of the issues I had with my grievances being
8    returned, because of the threats that I received,
9    because of -- because of the way how the assault
10   happened, I was not comfortable explaining or
11   providing any details to any of the correctional
12   officers, and I asked to speak to a PREA investigator.
13       Q.   Did you get to talk to a an investigator?
14       A.   No. I was taken back to confinement, placed
15   inside of a cell, Cell 1201. And it was at that time
16   that I started receiving response to one of my
17   grievance, the grievance that I filed for not allowing
18   the phones to work.
19            I stated then, I said that the phone systems
20   that was recently switched over, because the phone
21   system had been recently switched over to another
22   provider, Global Tel Link, did not allow the inmates
23   to dial out to the -- to the tip hotline. And I said
24   I've been trying to report a crime. I was trying to
25   make a report for weeks, and I haven't been able to do

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

40

1    so.
2            I never mentioned anything about the assault.
3    I never said I was assaulted. I just -- and this was
4    filed June 29th, and it was received July 8th, the
5    same day which the -- the assault had been reported to
6    -- to Columbia Annex. And the response was system
7    shows that you have been placed in confinement
8    interview and refused to cooperate with investigation.
9            Well, not only did it fail to address the
10   issue about the phones not working, it specifically
11   said that I was -- refused to cooperate with the
12   investigation when I never -- the assault had not been
13   reported when I filed the grievance. The grievance
14   was filed on the 29th. The grievance was received on
15   July 8th. I never mentioned anything about any -- any
16   assault. So I -- I responded --
17       Q.   And when was it answered?
18       A.   The answer was system shows you have been
19   placed in --
20       Q.   No, but when was it answered? Do you
21   remember?
22       A.   It was received on the 8th. Well, possibly
23   on the 8th because it was double stamped. The
24   received date was obscure. It appears to be the 8th,
25   but then again it doesn't. Because the double stamp

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

41

1  to make it, it's altered.  It's --

2     Q.  But when was it answered?

3     A.  What was answered -- when was it returned to

4  me?  I believe the return date was the 12th on it.

5     Q.  Okay.

6     A.  So I appealed that.  I appealed it, and I

7  never received a response to it.

8     Q.  And --

9     A.  Yeah.  And it was at that time I learned that

10  officers had -- it was that time I received a

11  disciplinary report, I think -- yeah, an officer

12  stated that I was intoxicated.  I was under the

13  impression that I was under -- I was back in

14  confinement under investigation; that I was waiting to

15  speak to a PREA investigator.

16        I received a disciplinary report that stated

17  while -- while I was in the captain's office being

18  interviewed for PREA allegation that I was

19  intoxicated, and I received a disciplinary action and

20  receive 60 days in confinement.  Just completely

21  unheard of.

22     Q.  Okay.  Let's get back to the PREA

23  investigation.  Were you medically -- were you in a

24  medical exam?

25     A.  Well, after the -- after the -- after I was

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

42

1  -- left from the captain's office, I was led down to

2  the medical and they asked me some questions, the

3  medical team, and I responded.  And they placed me on

4  some medication.  I think it was some HIV preventative

5  medication; type of pills that if you come in contact

6  with someone who's HIV positive or may be positive or

7  high risk or you had some high-risk behavior or

8  activity, which in my case, I told them that -- yeah.

9  So they placed me on some medication to -- which I was

10  told was HIV preventative.

11     Q.  Okay.

12     A.  It was -- yeah.  It was -- since this was so

13  long after the assault had occurred, there was no --

14  it was determined by them that there will be no traces

15  of DNA so they didn't perform any tests.  I never

16  refused -- I never -- I never refused to comply with

17  any of the medical examinations.  But I was -- from

18  there, I was taken and placed back in confinement.

19     Q.  Okay.  And when you mean -- when you say that

20  you were placed back in confinement, the same building

21  where the defendant worked in?

22     A.  Yes.

23     Q.  Did you have any interactions with the

24  defendant?

25     A.  At that time, no, I don't -- I don't -- I

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

43

1    don't recall ever seeing him.  I don't recall seeing
2    him after that.  Maybe he did work inside of there,
3    but I cannot recall ever actually seeing him.
4        Q.    All right.  Some clarifying questions.  You
5    said that you seen Angel Herrera stab another inmate?
6        A.    Yes.
7        Q.    When did -- when did you see him do this?
8        A.    Sometime -- I was at Columbia Annex since
9    2019.  Sometime in between that.  I can't exactly
10   remember what it was.  It wasn't something that I was
11   trying to remember.  It was something I seen.  I
12   cannot give an exact date.  But I do remember seeing
13   -- is how I heard him -- how I became aware of him, I
14   seen him stab an inmate inside the chute.
15           And inside of the chute when coming back from
16   chow, when you're coming back from the chow hall, you
17   enter into a door and there's a chute that -- which is
18   another bar gate in front of it.  And this bar gate
19   does not open till the door closes.  It's referred to
20   as the rat trap, because there's a lot of stabbings or
21   a lot of incidents that goes down right there because
22   at that moment in time, you're locked inside of that.
23           So it was there that -- came back from chow,
24   I walked past -- I seen Angel Herrera.  He was not
25   inside of a dorm.  He was not living -- he was not

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

44

1    housed there.  I seen him on my way back.  I went
2    inside and when I looked back -- there was some
3    commotion and when I looked back, I seen Angel
4    wielding a knife at this other inmate, and he was --
5    he was -- the other inmate he had done stabbed, the
6    dude was trying -- he was trying to get -- he was
7    trying to get from around him.  He was running around.
8    It was crowded inside of there.
9           And someone was holding the door for Angel,
10   because I said, it's a bar gate that doesn't open
11   until this door closes.  So when I looked back, I seen
12   him wielding a knife and the dude was trying to get
13   away from him and Angel took off and left back outside
14   of the door.  Then he closed the door behind him, so
15   that it was locked inside there, and this --
16       Q.    Okay.  Mr. Andrews, I just wanted to know
17   what the date.  I didn't need the entire story.
18       A.    Okay.  Well, I don't -- I don't know the
19   date.  I can't tell you the date.
20       Q.    Do you know the year?
21       A.    I believe -- I think -- if I'm not mistaken,
22   probably was the same year, '21.  Could have been '20
23   but probably '21.
24       Q.    Okay.  All right.  Okay.  Is there anything
25   else you would like to add regarding the questions

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

45

1    posed here today?

2       A.   Yes.  After, when I was placed back in

3    confinement, I wrote several grievances in connection

4    with this.  A lot of these grievances did not get

5    responded to.  While I was filing a grievance, I

6    called -- I called out to audio/video recording

7    letting them know that I was placing grievances.

8    Yeah, I wrote a witness statement.  I wrote a witness

9    statement describing it, the -- the assault.

10      Q.   A witness statement for your PREA complaint

11   or for --

12      A.   For -- for a crime.  It's not a grievance.  A

13   witness statement is -- I was placing a witness

14   statement for a crime, the crime of sexual assault.

15   This is -- I was reporting a crime.  And I -- and that

16   was -- I think that was July 15th or the 14th because

17   I filed a succession of grievances at that time.

18           And it was at this time I knew that I was

19   aware that they was not responding to the grievance.

20   So when I was filing them, once I'm placing them in

21   there, I'm yelling outside of the cell that I filed a

22   grievance in regards to this, and this, and this and

23   that.  And at the time I filed a witness statement, I

24   put it up to the cell door to the window in view of

25   the camera, and I stated outside --

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

46

1       Q.   Did you -- but did you submit the witness

2    statement to anyone?

3       A.   To the grievance coordinator, to the person

4    who comes around and collects the grievances.  It's a

5    procedure of Chapter --

6       Q.   And what did the witness statement state?

7       A.   That I was sexually assaulted by Angel

8    Herrera.

9       Q.   And when did you file this witness statement?

10      A.   This was either July 14th or July 15, one of

11   those days.

12      Q.   All right.

13      A.   And I never got a response.

14      Q.   Okay.

15      A.   I never got a response.

16           And then when I was moved from there to

17   another unit, I continued to file grievances.  I

18   continued to file.  I filed grievance on -- to the

19   warden against the assistant warden for not returning

20   my grievances, which I filed for being placed inside

21   of the cell with Angel Herrera.

22           This grievance had been -- I filed the

23   informal grievance; that had been returned to me.

24   When I appealed it -- and I appealed it when I was --

25   at the time, I was out of confinement.  The Part C,

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

47

1   the receipt of the grievance, was returned to me. I

2   never got a copy of the grievance. Per Chapter 33, in

3   order to appeal the grievance, you must provide,

4   attach a copy of the grievance to it. So I did not

5   have a copy to attach to it.

6      Q.   Did you file any grievances regarding your

7   lack of responses?

8      A.   Yes. I filed a grievance to the warden

9   against the --

10     Q.   Were they responded to?

11     A.   Was it responded to? Yes, that was responded

12   to. And immediately that same day, I filed that, it

13   was either -- it was either -- it was either August

14   2nd or August 4th. I have all this logged down. I

15   can -- I just -- that same day that I filed a

16   grievance to the warden against the assistant warden,

17   I received copies because the Part C had the reference

18   log number of the grievance, but it just didn't have a

19   copy of --

20     Q.   So you did get the copies of your --

21     A.   No, I did not get the copies. I got Part C,

22   the receipt. It was no response. The only response

23   there is that's saying we have received your

24   grievance.

25     Q.   But did you request copies of your responses?

48

1     A.   I requested copies of my responses.

2     Q.   And what was the response?

3     A.   The response was -- I believe the response

4   was the system shows that you received copies of it.

5   But that same day, copies were furnished to me. I --

6   I don't know if --

7     Q.   Copies of what?

8     A.   Of -- of my formal grievance, of me grieving

9   that I was placed inside of a cell with Angel Herrera.

10     Q.   So you did receive cop- -- you did get back

11   copies of your grievances' responses and grievances?

12     A.   After the time had elapsed. You have a

13   certain day to respond to the grievance per Chapter

14   33. You have 15 to 30 days. This time had elapsed.

15   So I went home and did the next step and I appealed to

16   Tallahassee, and I explained that I'm not able to

17   provide a copy because none was turned to me.

18     Q.   But at this point you already had copies,

19   correct?

20     A.   No, I did not have copies. I'm grieving the

21   fact that I did not have copies.

22     Q.   But you just said -- you just said you had

23   gotten the copies.

24     A.   After the filing of this grievance. It

25   wasn't until I filed this grievance that I got copies,

49

1   that I received copies.  I filed the grievance between
2   August 2nd and August 4th, one of those dates.  After
3   I filed that grievance, then I got copies.
4       Q.   Okay.
5       A.   Then once I -- once I got a copy, I
6   reinitiated the entire grievance process and re-filed
7   all the grievance all over again.  But this was after
8   -- after I had been transferred to a different
9   institution.  So on my original appeal, I was not able
10  to provide copies because none was provided to me.
11  But I went on ahead and followed through with the
12  grievance process anyway.
13      Q.   All right.  So is there anything else that
14  you want to address that we haven't covered related to
15  this incident?
16      A.   Related to this incident?  Just one more
17  thing I would say that -- which I called cameras to
18  verify -- the one -- the person who was placing the
19  grievance inside of the locked grievance box -- and
20  this is Chapter 33, that grievance box is supposed to
21  be locked -- the cameras will show that the box was
22  not locked.  It was unsecured.  You can actually look
23  and see the grievances falling out of them.  And other
24  inmates was responding saying that they're not
25  returning the grievance.

50

1       Columbia Annex has a long history of not
2   responding to grievances, and I'm sure I'm not the
3   only one that can file this complaint.  But the griev-
4   -- oh, yeah.  Oh, yeah.  Oh, yeah, I almost forgot.  I
5   almost forgot.
6       On September 16th, I filed a report to the
7   Secretary of DOC, Mark Inch, re-reporting the sexual
8   assault that occurred on 5/16.  I also reported that
9   my grievance was not being response to.  I gave or
10  provided times and dates when I filed these
11  grievances.
12      I received a response on October 5th.  This
13  is after I had been transferred from Columbia, and I
14  was at Taylor CI.  I received a response saying that
15  your allegations have been reported, received and it
16  will be referred to -- to IG or to some investigator.
17  This is September 16th.
18      When I received this October 5th, saying that
19  it will be responded to, again, I never spoke to a
20  PREA investigator.  And I asked specifically --
21      UNKNOWN SPEAKER:  I have a question:  How
22  much longer are y'all going to be?  You only had
23  an hour scheduled.
24      MS. VILLALPANDO:  We won't have much time.
25  We were just reaching the end.

51

1      UNKNOWN SPEAKER:  Okay.  Thank you.

2          THE WITNESS:  And when I filed to the -- to

3      the secretary, I specifically asked to speak to a

4      PREA investigator, specifically asked to speak to

5      IG, specifically asked to speak to a mental health

6      counselor.

7      BY MS. VILLALPANDO:

8      Q.   Okay.

9      A.   I've never spoken to anyone.

10     Q.   Okay.

11     A.   And I stated that this was -- it was a

12     coordinated effort between the correctional officers,

13     administration to cover up the sexual assault because

14     everyone was aware of this.  At this time I was

15     confined.  I was yelling it out through the door

16     everyday.  No one would stop go the door and talk to

17     me.  I was -- I was --

18     Q.   What do you mean you were yelling out your

19     door?

20     A.   I was yelling out every time I filed a

21     grievance, "I'm filing a grievance in connection with

22     this.  I'm filing a witness statement I was sexually

23     --" I'm yelling this out in front of the camera.

24     Q.   At Columbia?

25     A.   At Columbia, while I'm filing a grievance,

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

---

52

1      while I'm turning in a witness statement.  I turned in

2      two witness statements.

3      Q.   While you were in confinement?

4      A.   Yeah, while I was in confinement.

5      Q.   You were yelling out that you were filing

6      grievances?

7      A.   Yep, in connection with the sexual assault.

8      Q.   Okay.  And also once you are released from

9      confinement?

10     A.   No, no.  This -- I had been placed back in

11     confinement for -- for being intoxicated.  This is

12     between -- this is after July 8th, in the month of

13     August, when I was tran- --

14     Q.   When did you start yelling out?

15     A.   After July 8th, after the -- after the

16     assault had been reported back.  I was only in

17     confinement for 10 days after the assault, and I was

18     released back to con- -- to -- to the pound.  And I

19     was filing grievances then, and I was receiving

20     responses for some of my grievances but not all.

21     After it had been reported, I was placed back in

22     confinement on July 8th.

23     Q.   And you were yelling that you were filing

24     grievances regarding the incident on May 16th?

25     A.   Yes.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

53

1    Q.    Okay.

2    A.    And also -- and also not have my grievance

3    responded to.

4          MS. VILLALPANDO:  Okay.  Well, that's all my

5    questions, Mr. Andrews.

6          Madam Court Reporter, can you stop the

7    recording?

8          THE WITNESS:  I can't touch this.  I can't

9    touch that.

10         MS. VILLALPANDO:  I would like to talk with

11   the -- with Mr. Andrews off the record.

12         THE COURT REPORTER:  Yes, ma'am.

13         MS. VILLALPANDO:  Okay.  Thank you.

14         THE COURT REPORTER:  You're welcome.

15         (Discussion off the record.)

16         MS. VILLALPANDO:  Court Reporter, that's it.

17         THE COURT REPORTER:  Okay.

18         MS. VILLALPANDO:  Thank you.

19         THE COURT REPORTER:  Thank you.

20         MS. VILLALPANDO:  Have a good day.

21         THE COURT REPORTER:  You too.  Bye-bye.

22         (Whereupon, the deposition concluded at 3:25

23   p.m.)

24

25

---

54

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA )

4    COUNTY OF LEON)

5

6

7

8

9          I, the undersigned authority, certify that BYRON

10   ANDREWS, personally appeared before me and was duly

11   sworn on the 26th day of March, 2024.

12

13         Signed this 26th day of March, 2024.

14

15

16

17         _Jessica Renchen_____
           JESSICA RENCHEN, Court Reporter
18         Notary Public - State of Florida

19

20

21

22

23

24

25

<div style="display:flex">
<div>

CERTIFICATE OF REPORTER                    55

1

2

3    STATE OF FLORIDA)

4    COUNTY OF LEON)

5

6        I, JESSICA RENCHEN, Registered Professional

7    Reporter, certify that I was authorized to and did

8    stenographically report the deposition of BYRON

9    ANDREWS, pages 1 through 53; that a review of the

10   transcript **WAS REQUESTED**; and that the transcript is a

11   true and complete record of my stenographic notes.

12

13       I further certify that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am

17   I financially interested in the action.

18

19       DATED this 26th day of March, 2024.

20

21          *Jessica Renchen*
            JESSICA RENCHEN, Court Reporter.

22

23

24

25

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

</div>
<div>

56

1    TO:  BYRON ANDREWS
     C/O:  DC# B06604
2    Florida State Prison
     Post Office Box 800
3    Raiford, Florida, 32083

4    IN RE:  BYRON ANDREWS VS SGT. CICCONE
     CASE NO:  3:23-cv-88-MMH-JBT
5

6    Please take notice that on the 26th day of March,
     2024, you gave a deposition in the above cause.  At
7    that time, you did not waive your signature.

8    Please make arrangements with For The Record at
     850-222-5491 to exercise your right to read and sign
     the transcript.
9
     If you do not read and sign the deposition within 30
10   days or at such other time as instructed by counsel,
     the original, which has already been forwarded to the
11   ordering attorney, may be filed with the Clerk of the
     Court and your reading and signing may be considered
12   waived.

13   If you wish to waive your signature now, please sign
     your name in the blank at the bottom of this letter
14   and return it to the address listed below.

15   Very truly yours,

16   *Jessica Renchen*
     JESSICA RENCHEN, Court Reporter
17
     For The Record
18

19   I do hereby waive my signature.

20   _____

21

22

23

24

25

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

</div>
</div>

```
                                                    57
 1                          ERRATA SHEET
            DO NOT WRITE ON TRANSCRIPT ~ ENTER CHANGES
 2
        IN RE:  BYRON ANDREWS VS SGT. CICCONE
 3      CASE NO:  3:23-cv-88-MMH-JBT
        DATE TAKEN:  March 26, 2024
 4      DEPONENT:  BYRON ANDREWS

 5      PAGE_____ LINE_____ SHOULD BE_____

 6      PAGE_____ LINE_____ SHOULD BE_____

 7      PAGE_____ LINE_____ SHOULD BE_____

 8      PAGE_____ LINE_____ SHOULD BE_____

 9      PAGE_____ LINE_____ SHOULD BE_____

10      PAGE_____ LINE_____ SHOULD BE_____

11      PAGE_____ LINE_____ SHOULD BE_____

12      PAGE_____ LINE_____ SHOULD BE_____

13      PAGE_____ LINE_____ SHOULD BE_____

14      PAGE_____ LINE_____ SHOULD BE_____

15      PAGE_____ LINE_____ SHOULD BE_____

16      PAGE_____ LINE_____ SHOULD BE_____

17      PAGE_____ LINE_____ SHOULD BE_____

18      PAGE_____ LINE_____ SHOULD BE_____

19      PAGE_____ LINE_____ SHOULD BE_____

20

21      Under penalties of perjury, I declare that I have read
        the foregoing document and that the facts stated in it
22      are true.

23      _____
        DATE                        BYRON ANDREWS
24

25


        FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491
```

57

1                          ERRATA SHEET
           DO NOT WRITE ON TRANSCRIPT ~ ENTER CHANGES
2
      IN RE:  BYRON ANDREWS VS SGT. CICCONE
3     CASE NO:  3:23-cv-88-MMH-JBT
      DATE TAKEN:  March 26, 2024
4     DEPONENT:  BYRON ANDREWS

5     PAGE_____ LINE_____ SHOULD BE_____

6     PAGE_____ LINE_____ SHOULD BE_____

7     PAGE_____ LINE_____ SHOULD BE_____

8     PAGE_____ LINE_____ SHOULD BE_____

9     PAGE_____ LINE_____ SHOULD BE_____

10    PAGE_____ LINE_____ SHOULD BE_____

11    PAGE_____ LINE_____ SHOULD BE_____

12    PAGE_____ LINE_____ SHOULD BE_____

13    PAGE_____ LINE_____ SHOULD BE_____

14    PAGE_____ LINE_____ SHOULD BE_____

15    PAGE_____ LINE_____ SHOULD BE_____

16    PAGE_____ LINE_____ SHOULD BE_____

17    PAGE_____ LINE_____ SHOULD BE_____

18    PAGE_____ LINE_____ SHOULD BE_____

19    PAGE_____ LINE_____ SHOULD BE_____

20

21    Under penalties of perjury, I declare that I have read
      the foregoing document and that the facts stated in it
22    are true.
           7-18-24
23    _____    _____
      DATE                               BYRON ANDREWS
24

25

      FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491