**33-601.800 Close Management.**

(1) Definitions.

(a) Close Management (CM) – the separation of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, when the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others.

(b) Close Management Levels – the three individual levels (CMI, CMII, and CMIII) associated with CM, with CMI being the most restrictive single cell housing level and CMIII being the least restrictive housing of the three CM levels.

(c) Critical Event – involvement of a CM inmate in one or more of the following events or behaviors: assignment to suicide observation status, homicide, attempted homicide, escape, attempted escape, physical or sexual assault or battery, or attempted physical or sexual assault or battery.

(d) Housing Supervisor – a correctional officer sergeant, or above, who is in charge of a CM unit for a particular shift.

(e) Individualized Service Plan (ISP) – a dynamic, written description of problems, goals, and services that is developed and implemented by the multi-disciplinary services team and the inmate. An ISP shall be developed and implemented for each CM inmate who suffers from mental impairment, or is at significant risk for developing such impairment, as determined by mental health staff.

(f) Institution – refers to all state correctional institutions as defined in Section 944.02, F.S., and all private correctional facilities as defined in Section 944.710, F.S.

(g) Institutional Classification Team (ICT) – the team consisting of the warden or assistant warden, classification supervisor, chief of security, and other members as necessary when appointed by the warden or designated by rule. The ICT is responsible for making work, program, housing, and inmate status decisions at an institution, and for making other classification recommendations to the State Classification Office. At private facilities, the Department of Corrections representative is to be considered a fourth member of the ICT when reviewing all job/program assignment, transfer, and custody recommendations/decisions. If a majority decision by the ICT is not possible, the decision of the Department representative is final. The only exception to the above listed membership of the ICT is the makeup of the ICT at the designated CM facilities when considering the placement, continuance, modification, or removal of inmates from CM units. For these purposes, multiple ICTs consisting of the following members can be utilized:

1. Warden, a chief of security or a correctional officer with a rank and position no less than CM housing lieutenant, and the classification supervisor or a senior classification officer who does not have the inmate on his or her assigned caseload; or

2. Assistant Warden of Operations, a chief of security or a correctional officer with a rank and position no less than CM housing lieutenant, and the classification supervisor or, in his or her absence from the institution, the acting classification supervisor; or

3. Assistant Warden of Programs, a chief of security or, in his or her absence from the institution, the acting chief of security, and the classification supervisor or a senior classification officer who does not have the inmate on his or her assigned caseload.

(h) Institutional Classification Team Docket – the official record of an ICT hearing.

(i) Lewd or Lascivious Exhibition – an inmate commits a lewd or lascivious exhibition when the inmate does any of the following in the presence of a person who is not in the custody of the Department:

1. Intentionally masturbates;

2. Intentionally exposes the genitals without authorization; or

3. Intentionally commits any other sexual act that does not involve actual physical or sexual contact with the victim, including sadomasochistic abuse, sexual bestiality, or the simulation of any act involving sexual activity.

(j) Major Rule Violation – any assault, battery, or attempted assault or battery; any lewd or lascivious exhibition; any spoken or written threat towards any person; inciting, attempting to incite, or participating in any riot, strike, mutinous act, or disturbance; fighting; possession or trafficking of weapons, ammunition, explosives, cell phones, unauthorized drugs, escape paraphernalia, or any other item that presents a threat to the safe and secure operation of the institution; and any escape or escape attempt.

(k) Medical Staff – a health care professional whose primary responsibility is the provision of physical health care to inmates.

(l) Mental Health Staff – a health care professional whose primary responsibility is the provision of mental health care to inmates.

(m) Multi-disciplinary Services Team (MDST) – staff representing multiple professions and disciplines responsible for ensuring inmate access to necessary assessment, treatment, continuity of care, and services in accordance with an inmate's identified mental health needs, and which collaboratively develops, implements, reviews, and revises an inmate's individualized service plan as

necessary.

(n) Offender Based Information System (OBIS) – the Department's offender database system that is utilized to organize and store security, classification, program, and other offender information.

(o) Restricted Labor Squad – an armed supervision work squad consisting of individually shackled CMII or CMIII inmates who work outside the secure perimeter on institution grounds.

(p) Review – the evaluation of pertinent information or documentation concerning an inmate's CM status to determine if changes or modifications are required or recommended.

(q) Security Threat Group (STG) – a formal or informal ongoing inmate/offender group, gang, organization, or association consisting of three or more members who have:

1. A common name or common identifying signs, colors, or symbols;

2. Members or associates who individually or collectively engage in or have engaged in a pattern of gang activity, criminal activity, or Department rule violations; or

3. Potential to act in concert to pose a threat or potential threat to the public, staff, visitors, other inmates or offenders, or the secure and orderly operations of an institution, probation office, other Department property, or Department activity or function.

(r) Senior Correctional Officer – a correctional officer lieutenant or above.

(s) State Classification Office (SCO) – the office or office staff at the central office level that is responsible for the final review of inmate classification decisions. Duties include approving, disapproving, or modifying ICT recommendations.

(t) Visit – an official tour and inspection of a CM unit by a staff member.

(2) Levels of Close Management.

(a) Close Management I (CMI).

1. CMI is the most restrictive single cell housing level of all the CM status designations.

2. An inmate assigned to CMI is ineligible for a work assignment.

3. An inmate may be placed in CMI without having previously been in CMII or CMIII.

4. Any of the following factors constitutes a basis for placement of an inmate in CMI status:

a. An incident causing death;

b. An act causing injury or an act that could have resulted in injury to another;

c. Any physical assault or battery on staff that caused injury;

d. The taking of a hostage or an attempt to take a hostage;

e. Instigation or incitement of a riot or disorder;

f. Creating or causing property damage in excess of $1,000;

g. Participation in or causing further institutional disruption during a riot or disorder during the inmate's current term of incarceration;

h. An escape or escape attempt involving use of a weapon, outside assistance, use of equipment or tools to penetrate a secure perimeter, or violence committed during or while on escape;

i. An escape or escape attempt from a secure perimeter;

j. An escape or escape attempt while under armed supervision while outside the perimeter of the institution;

k. Possession of weapons, ammunition, explosives, flammables, or initiation of or participation in trafficking of these items;

l. Trafficking in drugs;

m. Participation in a sexual assault or battery;

n. An inmate who is currently CMII or CMIII and shows an inability to adjust as evidenced by one or more subsequent major rule violation(s);

o. Documented leadership in a STG that is certified by the threat assessment review committee in central office.

(b) Close Management II (CMII).

1. CMII is restrictive cell housing that may or may not be restricted to single cell housing.

2. An inmate may be placed in CMII without having previously been placed in CMIII. Any of the following factors constitutes a basis for placement of an inmate in CMII status:

a. An act or acts in the community, during other periods of confinement, or any circumstances associated with the current period of incarceration such that safety and security concerns regarding the institution, the staff, or the public suggest further review of the inmate is necessary prior to placement in general population;

 b. A pattern of predatory actions that makes an inmate a threat to others;

 c. An act causing injury or an act that could have resulted in injury to another;

 d. An escape or an escape attempt from within the secure perimeter of an institution without violence, the use of weapons, the taking of hostages, the use of equipment or tools, or outside assistance;

 e. Participation in a riot or disorder during any period of incarceration;

 f. A pattern of behavior during the present period of incarceration involving acts of violence or threats of violence;

 g. Initiation or participation in a contraband trafficking operation involving negotiables, escape paraphernalia (other than items listed in sub-subparagraph (2)(a)4.h.), or other items that present a threat to the safe and secure operation of the institution;

 h. Presenting a risk to another inmate's safety and well-being as identified by one or more acts that demonstrate an inability to live in general population without endangering others;

 i. An inmate who is currently CMIII and shows an inability to adjust as evidenced by one or more subsequent major rule violation(s).

 (c) Close Management III (CMIII).

 1. CMIII is the least restrictive cell housing unit in CM.

 2. CMIII will only be used as a step-down placement for inmates in CMI or CMII. It will not be used as an entry point into CM.

 (3) Procedures for Placement in Close Management.

 (a) CM is the separation of an inmate from the general population, for reasons of security or the order and effective management of the institution, when the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others. The Secretary shall designate which institutions are authorized to house CM inmates based on the needs of the Department.

 (b) When an inmate in general population has committed acts that threaten the safety of others, threaten the security of the institution, or demonstrate an inability to live in the general population without abusing the rights and privileges of others, the inmate shall be placed in administrative confinement pending CM review by the ICT. When an inmate in any other confinement status has committed acts that threaten the safety of others, threaten the security of the institution, or demonstrate an inability to live in a segregated population without abusing the rights and privileges of others, the inmate shall be housed in his or her current status pending CM review. Inmates being considered for CM who have completed disciplinary confinement and the final decision regarding CM placement has not been determined will be housed in administrative confinement until the review and decision is made by the SCO.

 (c) The classification officer shall complete section I of the Report of Close Management, Form DC6-233C. Form DC6-233C is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-12598. The effective date of the form is 01/21. Upon completion of section I, the classification officer shall forward Form DC6-233C to the classification supervisor. The classification officer shall ensure that the inmate receives a copy of Form DC6-233C to prepare for the CM review. The staff member delivering Form DC6-233C to the inmate shall document on Form DC6-233C that the inmate was informed of his or her allotted time to prepare for the review. The inmate will be given a minimum of 48 hours to prepare for the review unless waived by completing a Close Management Waiver, Form DC6-265. Form DC6-265 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-12599. The effective date of the form is 01/21. The inmate may present information verbally or in writing for consideration by the ICT.

 (d) Prior to docketing an inmate's case for CM review by the ICT, the classification supervisor will submit a referral to the senior psychologist for evaluation of the inmate utilizing the Close Management Referral Assessment, Form DC6-128. Form DC6-128 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-03418. The effective date of the form is 12/13.

 (e) Mental health staff will complete Form DC6-128, within five working days of receipt and return it to the classification supervisor.

 (f) Upon receiving the completed Form DC6-128, the classification supervisor will submit the case for placement on the ICT docket.

 (g) ICT Hearing. The ICT shall evaluate the recommendations for CM placement and the mental health assessment, interview the inmate, and consider all relevant information provided to the ICT by the inmate. The ICT shall ensure that the inmate was given

a minimum of 48 hours to prepare for the review unless waived by completing Form DC6-265. The ICT shall document on Form DC6-233C that the inmate was allowed at least 48 hours to prepare for the review. The ICT shall inquire whether the inmate needs staff assistance. A staff member shall be assigned to assist an inmate when the ICT determines that the inmate is illiterate or does not understand English, has a disability that would hinder the inmate's ability to represent himself or herself, or when the complexity of the issues makes it unlikely that the inmate will be able to properly represent himself or herself. Assistance can also be provided at the inmate's request. In the event a staff member is assigned to assist an inmate, it is the responsibility of the staff member to explain the CM recommendation and procedures to the inmate. Even though the staff member will be authorized to assist an inmate during the hearing and aid the inmate in presenting his or her position, the staff member shall not take the position of an advocate or defense attorney for the inmate. The ICT is authorized to postpone the case review to allow an inmate additional time to prepare. If an extension of time is given, the ICT shall document the postponement on Form DC6-233C. The inmate will appear at the hearing unless he or she demonstrates disruptive behavior, either before or during the hearing, that impedes the process, or the inmate waives his or her right to be present at the CM hearing. If the inmate waives his or her right to be present at the CM hearing Form DC6-265 shall be completed. In such cases, the review will be completed without the inmate present. The absence, removal, or presence of the inmate will be documented on Form DC6-233C. After the interview and review of all pertinent information including the mental health assessment, the ICT will make a recommendation to the SCO. This recommendation will be documented on Form DC6-233C. The ICT will inform the inmate of the basis for its decision and provide a copy of its decision to the inmate after the conclusion of the hearing. The ICT classification member will ensure that the results are entered in OBIS.

(h) The SCO will review the recommendations of the ICT, Form DC6-128, and other pertinent information before making the final decision regarding CM placement. This review will be on site and the SCO may interview the inmate, except in situations requiring more immediate action. In such case, the SCO will review the documentation in OBIS. The SCO will approve, disapprove, or modify the ICT's recommendation, or obtain further information from the ICT before reaching a final decision. If the ICT's recommendation is disapproved or modified by the SCO, the inmate will be informed of the decision in writing by the SCO. Inmate notification will not be required when the SCO approves the ICT's recommendation. After the review is complete, the SCO will document its decision in OBIS. A copy of Form DC6-233C will be kept in the inmate record file.

(4) Transfers from a Non-Close Managment Institution.

(a) Once a CM recommendation is made, the ICT will also enter a transfer recommendation in OBIS.

(b) The inmate will remain in administrative or current confinement status pending review and final decision of the SCO. If the inmate's release date from disciplinary confinement expires, the inmate shall be placed in administrative confinement until the review and decision is made by the SCO.

(c) If placement in CM is approved, the SCO will document its decision in OBIS and notify Population Management for transfer of the inmate to an appropriate CM institution.

(d) If the CM recommendation is disapproved, the SCO will determine if a transfer for other management reasons should be approved. The SCO will document its decision in OBIS. If a transfer is approved, the SCO will notify Population Management for transfer of the inmate to an appropriate non-CM institution.

(5) Transfers While Inmate Is in Close Managment Status.

(a) If an inmate in CM is reassigned to another level of CM that requires transfer to another institution, the time spent awaiting transfer will be taken into consideration when setting the schedule of reviews by the ICT at the receiving institution.

(b) To transfer an inmate in CM to another CM institution, the following will occur:

1. The ICT from the sending institution will recommend the appropriate level of CM based upon the criteria and facts for placement prior to the transfer.

2. Transfers will be limited to those inmates in CM as follows:

a. When an inmate is being recommended for a CM level that the sending institution is not capable of providing, based on institutional mission or CM stratification issues, or

b. Situations that involve special reviews. Inmates with protection or threat reviews involving inmates housed at the same CM institution will be handled within the CM unit and, unless exceptional circumstances exist, will not be transferred from one CM institution to another based solely on these reviews, or

c. Situations that require an inmate to be moved to a higher-level institution.

(c) The recommendation by the ICT to transfer a CM inmate will be reviewed by the SCO. If approved, the SCO will submit notification to Population Management for transfer of the inmate. The receiving institution shall then place the inmate directly into

the approved CM level without completing an additional evaluation.

(d) If the transfer recommendation is disapproved, the SCO will provide written notification to the ICT of the requesting institution of its decision not to transfer.

(e) After the review is complete, the SCO will document its decision in OBIS.

(6) Close Management Institutions and Facilities.

(a) The number of inmates housed in a CM cell will not exceed the number of bunks in the cell.

(b) The only exception to paragraph (6)(a) is during an emergency situation as declared by the warden or duty warden. The emergency will be made known to the regional director and to the emergency action center in the central office. If the exception exists in excess of 24 hours, the warden or duty warden must get specific authorization from the regional director to continue to house inmates beyond the 24-hour period in such conditions.

(c) Prior to placing inmates in the same cell, the inmate will be reviewed by the housing supervisor to determine if any of the inmates in the CM unit are a threat to the inmate being placed, or if the inmate being placed is a threat to other inmates in the unit.

(d) If the inmate cannot be placed for the reasons stated in paragraph (6)(c), the housing supervisor will place or maintain the inmate in administrative confinement until the issue can be expeditiously resolved. The case will be immediately forwarded to the ICT for review. The ICT will review the case, interview the inmate, and forward recommendations to the SCO. The SCO will review the case and may interview the inmate before making a final decision on the inmate's placement.

(e) All CM cells will be equipped with toilet facilities and running water for drinking and other sanitary purposes. Water in the cell can be turned off when necessary due to misbehavior. Misbehavior is defined as any activity exhibited by an inmate that causes an interruption in the water system and its proper function, such as intentionally clogging a toilet bowl or sink with paper in order to flood the housing area. It also includes the intentional misuse of the water for such purposes as throwing it on staff or other inmates, or mixing it with another substance for an unauthorized purpose. In such event, the inmate will be furnished with an adequate supply of drinking water by other means to prevent dehydration. This action can be taken in addition to formal disciplinary action being taken against the inmate pursuant to established procedures regarding disciplinary action. Any misbehavior from an inmate and subsequent action by security staff will be documented on the Daily Record of Special Housing, Form DC6-229. Form DC6-229 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, https://www.flrules.org/Gateway/reference.asp?No=Ref-00220. The effective date of the form is 4-6-11.

(f) Prior to placement of an inmate in a CM cell, the cell will be thoroughly inspected by the housing officer to ensure that it is in proper order. The housing officer shall document the cell's condition on Form DC6-221, Cell Inspection. After such time, the inmate housed in that cell will be responsible for the condition of the cell. Form DC6-221 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-01968. The effective date of the form is 12-16-01.

(g) CM cells will be physically separate from other confinement cells whenever possible given the physical design of the institution. Whenever this is not possible, physical barriers shall be placed to preclude the cross association of inmates in CM with inmates in other statuses. CM cells shall be built to permit verbal communication and unobstructed observation by the staff.

(h) Inmates shall be weighed upon entering CM, at least once a week while in CM, and upon leaving CM. The weight of the inmate shall be documented on Form DC6-229.

(7) Individualized Service Plan (ISP).

(a) The MDST will develop an ISP on Form DC4-643A, when deemed necessary by mental health staff. Form DC4-643A is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-07328. The effective date of the form is 8/16.

(b) The ISP will be developed based on the inmate's needs assessment and will take into consideration the inmate's behavioral risk, as determined by the MDST in accordance with subsection (8) of this rule.

(c) The ISP will incorporate mental health, programs, and other services required to address identified problems and to prevent the development or exacerbation of mental and other adjustment problems.

(d) An ISP shall be established within 14 days of CM placement of each inmate who suffers from mental impairment, or who is at significant risk for developing such impairment, as determined by mental health staff.

(e) If an ISP exists at the time of CM placement, it shall be updated within 14 days of CM placement to reflect current problems, goals, services, and providers. The ISP shall also be updated within 14 days of an inmate's transfer between CM institutions.

(f) The MDST shall review, and if indicated, revise the ISP as needed, but not less frequently than the following:

1. Within three working days of the inmate's involvement in a critical event.

2. Within 30 days of establishing or updating an ISP.

3. 120 days after the 30-day review.

4. Every 180 days after the 120-day review, until mental health staff determines that ongoing mental health care is no longer necessary, at which time the ISP will be closed.

(g) The ISP shall be signed by each member of the MDST.

(8) Behavioral Risk Assessment (BRA).

(a) The MDST shall determine the behavioral risk of each CM inmate by completing a BRA on Form DC4-729 or other validated risk assessment instrument. Form DC4-729 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-12597. The effective date of the form is 01/21.

(b) Behavioral risk shall be determined as follows:

1. Within three working days of the inmate's involvement in a critical event.

2. Within 14 days of CM placement.

3. Within 120 days following the 14-day assessment, and every 180 days thereafter.

(c) The BRA shall be completed at the above intervals regardless of S-grade or housing assignment, including, for example, when the CM inmate is housed outside the CM unit in order to access necessary medical or mental health care.

(d) Security shall consider results from the BRA and other information relevant to staff and inmate safety and institutional security in determining the level of restraints required during out-of-cell activities such as individual or group counseling.

(e) The ICT shall consider results from the BRA and other information relevant to institutional adjustment, staff and inmate safety, and institutional security when making recommendations for modification of the inmate's CM status.

(f) The SCO shall consider results from all BRAs and all results from mental health evaluations that have been completed since the inmate's last formal assessment and evaluation, and other information relevant to institutional adjustment, staff and inmate safety, and institutional security in its review of ICT recommendations made after CM placement.

(9) Mental Health Services.

(a) Chapter 33-404, F.A.C., Mental Health Services, shall apply to CM inmates except where otherwise specified herein.

(b) CM inmates shall be allowed out of their cells to receive mental health services as specified in an ISP unless, within the past 4 hours, the inmate has displayed hostile, threatening, or other behavior that could present a danger to others. Security staff shall determine the level of restraint required while CM inmates access services outside their cells.

(10) Conditions and Privileges in Close Management Units.

(a) Clothing – Inmates in CM shall be provided the same clothing and clothing exchange as inmates in general population unless there are facts to suggest that, on an individual basis, exceptions are necessary for the welfare of the inmate or the security of the institution. In such cases, the exceptions shall be documented on Form DC6-229 and approved by the chief of security. Shower slides may be substituted for regulation shoes. Any item may be removed from the cell in order to prevent the inmate from inflicting injury to himself or herself or others or to prevent the destruction of property or equipment. If an inmate's clothing is removed, a modesty garment shall be immediately obtained and given to the inmate. If the inmate chooses not to wear the garment, the garment shall be left in the cell and this action shall be documented on Form DC6-229. Under no circumstances shall an inmate be left without a means to cover himself or herself.

(b) Bedding and Linen – Bedding and linen for inmates in CM shall be issued and exchanged the same as they are for inmates in general population. Any exceptions shall be based on potential harm to individuals or a threat to the security of the institution. The shift supervisor or the senior correctional officer must approve the exception initially. Such exceptions shall be documented on Form DC6-229, and the chief of security shall make the final decision regarding the exception no later than the next working day following the action.

(c) Personal Property – Inmates in CM shall be allowed to retain personal property including stamps, watches, rings, writing paper, envelopes, and health and comfort items unless they pose a threat or potential threat to the public, staff, visitors, other inmates, or the secure and orderly operations of an institution. Inmates in CM may possess a Walkman-type radio with approved headphones in accordance with Rule 33-602.201, F.A.C. Inmates in CMIII may possess a tablet in accordance with Rule 33-602.900, F.A.C. Exceptions or restrictions regarding any item will be documented on Form DC6-229. An Inmate Impounded

Property List, Form DC6-220, will be completed by security staff and signed by the inmate designating any personal items that are removed. Form DC6-220 is incorporated by reference in Rule 33-602.201, F.A.C. The original Form DC6-220 shall be placed in the inmate's property file and a copy of the form will be given to the inmate for his or her records. If items of clothing, bedding, or personal property are removed in order to prevent the inmate from inflicting injury to himself, herself, or others, to prevent the destruction of property or equipment, or to prevent the inmate from impeding security staff from accomplishing functions essential to the unit and institutional security, staff shall reassess the need for continued restriction every 72 hours thereafter. Based on these reassessments, the warden will make the final determination regarding the continued denial or return of the items. The items will be returned to the inmate when no further behavior or threat of behavior of the type leading to the restriction has occurred during any 72-hour reassessment period.

(d) Comfort Items – Inmates in CM may possess personal hygiene items and other medically necessary or prescribed items such as eye glasses or hearing aids, unless they pose a threat or potential threat to the public, staff, visitors, other inmates, or the secure and orderly operations of an institution. Inmates in CM shall not possess any products that contain baby oil, mineral oil, cocoa butter, or alcohol. In the event items that inmates in CM are not normally prohibited from possessing are restricted, the senior correctional officer shall be notified and must approve the action taken, or the item must be returned to the inmate. Any action taken shall be recorded on Form DC6-229, which must be reviewed by the chief of security. When any personal property is removed, Form DC6-220 designating what personal items were removed shall be completed by security staff and signed by the inmate. The following comfort items shall be provided at a minimum: toothbrush, toothpaste, bar of soap, towel or paper towels, feminine hygiene products for women, and toilet tissue.

(e) Personal Hygiene – Inmates in CM shall meet the same personal hygiene standards as required of inmates in general population.

1. At a minimum, each inmate in CM shall shower three times per week and on days that the inmate works.

2. Any male inmate who elects to be clean shaven shall be clipper shaved three times per week. Any male inmate who elects to grow and maintain a half-inch beard shall have his beard maintained in accordance with Rule 33-602.101, F.A.C. The possession and use of shaving powder in CM is prohibited.

3. Hair care shall be the same as that provided to and required of inmates in general population.

(f) Diet and Meals – All inmates in CM shall receive the same institutional meals that are available to inmates in general population except that if any item on the regular menu would create a security problem in CM, then another item of comparable quality shall be substituted. An alternative meal (special management meal) may be provided for any inmate in CM who uses food or food service equipment in a manner that is hazardous to himself or herself, staff, or other inmates. The issuance of a special management meal will be in strict accordance with rule 33-602.223, F.A.C. Any deviation from established meal service is to be documented by security staff on Form DC6-229.

(g) Canteen Items.

1. After 30 days in CM with no major rule violations during this period, inmates in CMI and CMII will be allowed to make canteen purchases through canteen order once per week unless restricted by disciplinary action. Inmates in CMI and CMII will be allowed to purchase up to five non-food items and five food items. In making this determination, with the exception of stamps and notebook paper, it is the number of items that is counted not the type of item. For example, three security pens count as three items, not one item. Twenty-five stamps or fewer will count as one item and two packages or less of notebook paper will count as one item.

2. Inmates in CMIII with no major rule violations will be allowed to make canteen purchases through canteen order once per week unless restricted by disciplinary action. Inmates in CMIII will be allowed to purchase up to five non-food items and ten food items. In making the determination, with the exception of stamps and notebook paper, it is the number of items that is counted not the type of item. For example, three packages of cookies count as three items, not one item. Twenty-five stamps or fewer will count as one item and two packages or less of notebook paper will count as one item.

3. Any disciplinary reports received by an inmate in which there is a guilty finding and placement in disciplinary confinement or suspension of canteen privileges between the time that he or she requests canteen food items and the delivery of those items will result in disapproval of the requested items.

4. CM inmates who submit an order for canteen items and then refuse delivery shall be subject to disciplinary action and loss of canteen privileges.

(h) Religious Accommodations – Inmates in CM shall be allowed to participate in religious ceremonies that can be accomplished at cell-side (for example, communion). Additionally, CM inmates shall be allowed to possess religious publications as

defined in Rule 33-503.001, F.A.C., and have access to a spiritual advisor or clergy visit with citizen clergy persons at a time and location approved by the warden. Religious publications shall not count toward the limit on personal book possession set forth in paragraph (10)(l) of this rule, but are subject to the storage space provisions of Rule 33-602.201, F.A.C.

(i) Legal Access – An inmate in CM will have access to his or her personal legal papers and law books and have correspondence access with the law library. Access to the law library will be obtained through delivery of research materials to an inmate's cell, and access to visits with certified inmate law clerks. Although the inmate may not be represented by an attorney at any administrative hearing under this rule, access to an attorney or aide to that attorney will be granted for legal visits at any reasonable time during normal business hours pursuant to Rule 33-601.711, F.A.C. Indigent inmates will be provided paper and writing utensils in order to prepare legal papers. Inmates who are not indigent will be allowed to purchase paper and envelopes from the canteen for this purpose pursuant to paragraph (10)(g) of this rule. Inmates with disabilities that hinder the preparation of legal correspondence will be allowed the use of authorized auxiliary aids. An inmate who is provided an authorized auxiliary aid shall also be allowed access to a certified inmate law clerk for the purpose of preparing legal documents, legal mail, or filing grievances.

(j) Correspondence – Unless otherwise stated in this rule, inmates in CM shall have the same opportunities for correspondence that are available to inmates in general population.

(k) Writing Utensils – Inmates in CM shall possess only security pens. Other types of pens or pencils shall be confiscated and stored until the inmate is released from CM. If a security pen is not available, the inmate shall be allowed to sign out a regular pen from the confinement unit officer. All care shall be taken to ensure that an inmate who requests access to a pen in order to prepare legal documents or legal mail or to file a grievance with the Department has access to a pen for a time period sufficient to prepare the legal mail, documents, or grievance. Inmates shall be allowed to purchase security pens pursuant to paragraph (10)(g) of this rule. An inmate who has been provided an authorized auxiliary aid will be allowed access to such for the purpose of reading and preparing correspondence.

(l) Reading Materials – Reading materials are allowed in CM unless they pose a threat to the safety, security, or sanitation of the institution. An inmate may possess up to three personal soft cover books. If it is determined that the books pose a safety, security, or sanitation risk, the items will be removed. Such removal will be documented on Form DC6-229. If items are removed in order to prevent the inmate from inflicting injury to himself or herself or others, or to prevent the destruction of property or equipment, staff shall reassess the need for continued restriction every 72 hours thereafter. Based on these reassessments, the warden will make the final determination regarding the continued denial or return of the items. The items will be returned to the inmate when no further behavior or threat of behavior of the type leading to the restriction has occurred during any 72-hour reassessment period. An inmate who receives services from the Bureau of Braille and Talking Book Library will be allowed to possess his or her tape player, devotional or scriptural material tapes, and other books on tape that are in compliance with Rule 33-501.401, F.A.C.

(m) Exercise – Those inmates confined on a 24-hour basis excluding showers and clinic trips may exercise in their cells. If the inmate requests a physical fitness program handout, the wellness specialist or the CM officer shall provide the inmate with an in-cell exercise guide and document such on Form DC6-229. In addition, an exercise schedule shall be implemented to ensure a minimum of six hours per week (two hours three days per week) of exercise out of doors. The assignment and participation of an inmate on the restricted labor squad or other outside work squad required to work outside at least one day per week will satisfy the minimum exercise requirements for the week. All outdoor exercise periods shall be documented on Form DC6-229. The ICT is authorized to restrict exercise for an individual inmate only when the inmate is found guilty of a major rule violation as defined in this rule, or if the inmate has a pending disciplinary hearing for a major rule violation as defined in this rule. Inmates shall be notified in writing of this decision and may appeal through the grievance procedure. The denial of exercise shall be for no more than 15 days per incident and for no longer than 30 days in cumulative length. Medical restrictions determined by health services staff can also place limitations on the amount and type of exercise permitted. Such restrictions of exercise periods will be documented on Form DC6-229. A disabled inmate who is unable to participate in the normal exercise program will have an exercise program developed for him or her that will satisfy the need for exercise and take into account the particular inmate's limitations. CM inmates shall be allowed equal access to outdoor exercise areas with exercise stations.

(n) At a minimum, wellness services for CM inmates at all levels shall be provided through cell-front tutoring, wellness puzzles, and the wellness education course.

(11) Programs and Privileges in Close Management Units.

(a) While in CM, an inmate's movement within the institution and contacts with other individuals will be restricted. An inmate's privileges will be limited depending on the specific CM level to which the inmate is assigned. If an inmate transfers to a

less restrictive level due to satisfactory adjustment, the adjustment period required for any privilege shall be waived. Upon placement in CM, inmates shall receive a copy of the Close Management Housing Unit Instructions, Form NI1-046. Form NI1-046 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, https://www.flrules.org/Gateway/reference.asp?No=Ref-12600. The effective date of the form is 09-29-11.

(b) CMI. Privileges for an inmate assigned to CMI are as follows:

1. Inmates in CMI may participate in in-cell educational opportunities and other programs as directed by the inmate's ISP or Individualized Education Programs Form, unless precluded by safety or security concerns.

2. Inmates in CMI may check out three soft cover books from the library at least once per week and possess no more than three soft cover library books at any given time. An inmate who receives services from the Bureau of Braille and Talking Book Library will be allowed to check out three books in braille or on tape per week and possess no more than three books at any given time, even though the actual number of tapes may be more than three per book. Books in braille or on tape checked out from the library shall not count toward the limit on personal book possession set forth in paragraph (10)(l) of this rule.

3. Inmates in CMI may conduct routine inmate bank transactions.

4. Inmates in CMI may subscribe to, purchase, or receive no more than one periodical that is printed and distributed more frequently than weekly and four other periodicals that are printed and distributed weekly or less frequently than weekly. An inmate who receives services from the Bureau of Braille and Talking Book Library will be allowed to receive up to four issues of a periodical.

5. Inmates in CMI may make one telephone call of the length allowed by Rule 33-602.205, F.A.C., every 30 days after 30 days in CM with no major rule violations during this period, as well as emergency telephone calls and telephone calls to an attorney pursuant to Rule 33-602.205, F.A.C.

6. Unless restricted pursuant to Rule 33-601.731, F.A.C., inmates in CMI shall be eligible to receive one two-hour non-contact personal visit by appointment:

a. After completing 30 days in CM with no major rule violations during this period.

b. If found guilty of any major rule violations while assigned to CMI, inmates are eligible to be considered for visits 30 days following release from disciplinary confinement or the disciplinary hearing if a penalty other than disciplinary confinement was imposed.

c. Inmates in CMI are eligible to receive one two-hour non-contact personal visit by appointment after each subsequent 30-day period with no major rule violations unless security or safety concerns would preclude a visit.

d. All visits for inmates in CMI will be non-contact personal visits.

7. Inmates in CMI are not permitted to access kiosks, kiosk services, or tablet services as provided for in Rule 33-602.900, F.A.C.

8. Inmates in CMI do not have video visitation privileges as provided for in Rule 33-602.901, F.A.C.

(c) CMII. In addition to the programs provided for inmates in CMI and those privileges outlined in subparagraphs (11)(b)1.-4. of this rule, the following privileges are authorized for inmates in CMII:

1. Unless restricted pursuant to Rule 33-601.731, F.A.C., inmates in CMII will be eligible to receive one two-hour non-contact personal visit by appointment:

a. After completing 30 days in CM with no major rule violations during this period.

b. If found guilty of any major rule violations while assigned to CMII, inmates are eligible to be considered for visits 30 days following release from disciplinary confinement or the disciplinary hearing if a penalty other than disciplinary confinement was imposed.

c. An inmate in CMII is eligible to receive one three-hour non-contact personal visit by appointment only after each 14-day period during which the inmate has no major rule violations unless an emergency exists or security concerns dictate otherwise.

d. All visits for inmates in CMII will be non-contact personal visits.

2. Inmates in CMII may make one telephone call of the length allowed by Rule 33-602.205, F.A.C., every 14 days after 30 days in CM with no major rule violations during this period, as well as emergency telephone calls and calls to attorneys as provided in Rule 33-602.205, F.A.C.

3. Inmates in CMII with no major rule violations shall be allowed access to the day room area for social purposes, including watching television programs, for up to two days per week, not to exceed four 4 hours per occasion or to extend beyond 10:00 p.m. This is allowed only when it does not conflict with organized program activities. The number of participants at any one time will be

determined by the senior correctional officer in consultation with the duty warden. This determination will be based on considerations such as day room size, availability of seating, and safety and security issues associated with the availability of supervising staff, as well as staff available for response should a problem develop. Inmates in CMII will be restrained during dayroom activities unless it is determined by the senior correctional officer that an inmate can safely participate without restraints.

4. Participation of inmates in CMII in educational and program opportunities shall be in-cell or out-of-cell as determined by security and programs staff.

5. Inmates in CMII are not permitted to access kiosks, kiosk services, or tablet services as provided for in Rule 33-602.900, F.A.C.

6. Inmates in CMII do not have video visitation privileges as provided for in Rule 33-602.901, F.A.C.

(d) CMIII. In addition to the programs provided above for inmates in CMII, the following privileges are authorized for inmates in CMIII:

1. Unless restricted pursuant to Rule 33-601.731, F.A.C., inmates in CMIII shall be eligible to receive one two-hour contact personal visit by appointment.

a. Inmates in CMIII shall be subject to placement on non-contact visiting status pursuant to Rule 33-601.735, F.A.C.

b. If found guilty of a major rule violation while assigned to CMIII, inmates in CMIII are eligible to be considered for visits 14 days following release from disciplinary confinement or the disciplinary hearing if a penalty other than disciplinary confinement was imposed.

c. An inmate in CMIII is eligible to receive one four-hour contact visit by appointment only after each 14-day period during which the inmate has no major rule violations unless an emergency exists or security concerns dictate otherwise. The warden will determine the level of supervision and restraint required.

2. Inmates in CMIII with no major rule violations, shall be allowed access to the day room area for social purposes, including watching television programs, for up to five days per week, not to exceed four 4 hours per occasion or to extend beyond 10:00 p.m. This is allowed only when it does not conflict with organized program activities. The number of participants at any one time will be determined by the senior correctional officer in consultation with the duty warden. This determination will be based on considerations such as day room size, availability of seating, and safety and security issues associated with the availability of supervising staff, as well as staff available for response should a problem develop. Inmates in CMIII shall not be restrained during dayroom activities unless security or safety concerns require otherwise.

3. Inmates in CMIII with no major rule violations shall be allowed to make one telephone call of the length allowed by Rule 33-602.205, F.A.C., every seven days, as well as emergency telephone calls and calls to attorneys as provided in Rule 33-602.205, F.A.C.

4. Inmates in CMIII shall be provided with at least the same opportunities for educational and program participation as provided to inmates in CMII.

5. Inmates in CMIII are permitted to access kiosks, kiosk services, and tablet services as provided for in Rule 33-602.900, F.A.C.

6. Inmates in CMIII do not have video visitation privileges as provided for in Rule 33-602.901, F.A.C.

(12) Suspension of Privileges. The ICT shall suspend or limit an inmate's privileges if security and safety concerns would preclude an inmate from receiving certain privileges. Any action taken by the ICT regarding the suspension or limiting of privileges will be documented on Form DC6-229. Privileges suspended by the ICT in excess of 30 days will require the review and approval of the SCO.

(13) Work Assignments.

(a) The decision to make work assignments and the type of assignments made will be determined by the ICT. Inmates shall be provided the opportunity for work assignment consideration as determined by the ICT except when precluded by a doctor's orders for medical reasons.

(b) Inmates in CMI are restricted from all outside cell work activities. Inmates in CMII are only eligible for work assignments on restricted labor squads or in CMI, CMII, or death row housing units. Inmates in CMIII are eligible for work assignments at any CM housing unit doing work similar to those inmates in general population, and outside CM housing units only on restricted labor squads within the fenced perimeter area.

(c) Outside work assignments shall be performed during daylight hours.

(14) Restraint and Escort Requirements.

(a) CMI.

1. Prior to opening a cell for any purpose, including exercise, health care or disciplinary call-outs, telephone calls, recreation, and visiting, the inmate shall be handcuffed behind his or her back. If documented medical conditions require that the inmate be handcuffed in front, waist chains will be used in addition to the handcuffs and the escort officers shall be particularly vigilant.

2. A minimum of two officers shall be physically present at the cell whenever the cell door is opened.

3. Prior to escorting an inmate from a cell the inmate shall be thoroughly searched. If the inmate is being taken outside the immediate housing unit or designated adjacent exercise area, leg irons and other restraint devices shall be applied.

(b) CMII. The same restraints and escort requirements as provided for inmates in CMI above apply to inmates in CMII with the exception that the senior correctional officer shall be authorized to approve unrestrained participation in group and individual counseling, dayroom access, and inside work assignments.

(c) CMIII. Unless precluded by specific safety and security concerns, inmates in CMIII shall be escorted without restraints within the unit, to exercise areas attached to the unit, and for all program and privilege activity participation. The warden shall base any determination to require restraints on the security and safety needs of his or her individual institution and CM unit.

(d) Due to the unique mission of CM units, it is understood that more than one inmate may be out of his or her cell within the unit at any one time. However, whenever inmates are being escorted in restraints, there shall be one officer with each inmate and the inmates shall be kept at a distance from each other that will preclude any unauthorized physical contact. Extreme care shall be exercised when escorting restrained inmates in areas where unrestrained inmates are present. When possible, unrestrained inmates will be returned to their cells, removed from the wing or, at a minimum, closely supervised by additional staff until the escort of restrained inmates is completed.

(15) Contact by Staff.

(a) The following staff members are required to officially inspect and tour the CM unit. All visits by staff shall be documented on the Inspection of Special Housing Record, Form DC6-228. Form DC6-228 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-01969. The effective date of the form is 2-12-01. The staff member shall also document his or her visit on Form DC6-229 noting any discussion of significance, any action or behavior of the inmate, or any other important information that may have an influence or effect on the inmate's status of confinement. These visits shall be conducted at a minimum of:

1. At least every 30 minutes by a correctional officer, but on an irregular schedule.
2. Daily by the housing supervisor.
3. Daily by the officer-in-charge on duty for all shifts except in case of riot or other institutional emergency.
4. Daily by medical staff.
5. Weekly by the chief of security (when on duty at the institution) except in case of riot or other institutional emergency.
6. Weekly by the chaplain. More frequent visits will be made upon request of the inmate if the chaplain's schedule permits.
7. Weekly by mental health staff.
8. Weekly by the warden and assistant wardens.

(b) Classification officers must visit each inmate on his or her caseload each week and document the visit on Form DC6-229. The classification officer must record the inmate's status, upcoming reviews, issues, discussions of significance, action or behavior of the inmate, or any other important information that may have an influence or effect on the inmate's status of confinement.

(16) Review of Close Management Status.

(a) An ICT member shall review each inmate in CM at least once every week for the first 60 days and once every 30 days thereafter. The ICT member shall be the warden, assistant warden of operations, assistant warden of programs, a chief of security, or classification supervisor. The purposes of this review shall be to reduce the inmate's status to the lowest management level possible or return the inmate to general population as soon as the facts of the case indicate that this can be done safely, and, if applicable, review the inmate's disciplinary confinement status as outlined in subsection 33-602.222(8), F.A.C. If an ICT review for modification of an inmate's CM status, release to general population, or release from disciplinary confinement is indicated upon completion of the ICT member's weekly or 30-day review, the ICT member shall notify the classification supervisor. The classification supervisor shall ensure that the case is placed on the ICT docket for review. During the review, the ICT shall consider the results of the BRAs and mental health evaluations that have been completed prior to the review, and other information relevant to institutional adjustment, staff and inmate safety, and institutional security.

(b) All services provided by any mental health or program staff member shall be recorded on Form DC6-229, which shall be kept in the CM unit.

(c) When an inmate has not been released to general population and is in any CM status for six months, the classification officer shall interview the inmate and shall prepare a formal assessment and evaluation on Form DC6-233C. Such reports shall include a brief paragraph detailing the basis for the inmate's CM status, the inmate's behavior and activities during the six-month period, and whether the inmate should be released, maintained at the current level, or modified to another level of CM. The case shall be forwarded to the classification supervisor who shall docket the case for ICT review.

(d) The ICT shall review the Form DC6-233C prepared by the classification officer, consider the results of BRAs, mental health evaluations, and any other information relevant to institutional adjustment, staff and inmate safety, and institutional security, and insert any other information regarding the inmate's status. If applicable, the ICT shall review the inmate's disciplinary confinement status in accordance with Rule 33-602.222, F.A.C. The inmate shall be present for the review unless he or she demonstrates disruptive behavior, either before or during the review, that impedes the process, or the inmate waives his or her right to be present at the review by completing Form DC6-265. The presence, absence, or removal of the inmate will be documented on Form DC6-233C. The ICT's CM and, if applicable, disciplinary confinement status recommendations shall be documented in OBIS and on Form DC6-233C. If it is determined that no justifiable safety and security issue exists for the inmate to remain in CM, the ICT shall forward its recommendation for release to the SCO for review. For an inmate to remain in CM, the ICT must justify the safety and security issues or circumstances that can only be met by maintaining the inmate at the current level or modifying the inmate to another level of CM.

(e) The SCO shall conduct an onsite interview with each inmate at least once every six months or as often as necessary to determine if continuation, modification, or removal from CM status is appropriate. The SCO shall review all reports prepared by the ICT concerning an inmate's CM status and, if applicable, disciplinary confinement status, consider the results of BRAs, mental health evaluations, and any other information relevant to institutional adjustment, staff and inmate safety, and institutional security. The SCO shall interview the inmate unless exceptional circumstances exist or the inmate is approved for release to general population. If it is determined that no justifiable safety and security issues exist for the inmate to remain in CM, the SCO shall cause the inmate to be immediately released. For an inmate to remain in CM, the SCO must determine based on all available information that there are safety and security issues or other circumstances that justify maintaining the inmate at the current level or at a modified level of CM. If applicable and in accordance with Rule 33-602.222, F.A.C., the SCO shall determine whether the inmate is to continue in or be removed from disciplinary confinement status. The SCO's decisions shall be documented in OBIS and on Form DC6-233C. The SCO shall advise the inmate of its decision.

(f) Reviews required by this subsection shall be completed regardless of the inmate's housing assignment, including when a CM inmate is housed outside the CM unit in order to access medical or mental health care.

(g) Before an inmate is released from CM, written authorization must be obtained by the SCO from the regional director if any of the following apply:

1. The inmate has been convicted, regardless of whether adjudication is withheld, of any assault or battery, or any attempted assault or battery, on a staff member that constitutes a felony that occurred during the inmate's current period of incarceration;

2. The inmate has an active detainer as a result of any assault or battery, or any attempted assault or battery, on a staff member that constitutes a felony that occurred during the inmate's current period of incarceration; or

3. The inmate is confined in Florida under the Interstate Corrections Compact and has been convicted, regardless of whether adjudication is withheld, of any assault or battery, or any attempted assault or battery, on a staff member that constitutes a felony in the state from which he or she was transferred that occurred during the inmate's current period of incarceration.

(17) Close Management Records.

(a) A Report of Close Management, Form DC6-233C, shall be kept for each inmate placed in CM.

(b) A Daily Record of Special Housing, Form DC6-229, shall be maintained for each inmate as long as the inmate is in CM. Form DC6-229 shall be utilized to document any activities, including cell searches, items removed, showers, outdoor exercise, haircuts, and shaves. If items that inmates in CM are not prohibited from possessing are denied or removed from the inmate, the shift supervisor or the senior correctional officer must approve the action initially. The Central Office ADA coordinator shall be contacted within 24 hours if any item is removed that would be considered an authorized auxiliary aid or device that ensures a disabled inmate an equal opportunity as a non-disabled inmate. The items denied or removed shall be documented on Form DC6-229 and the chief of security shall make the final decision regarding the action no later than the next working day following the

action. Staff shall reassess the need for continued restriction every 72 hours thereafter as outlined in subsection (10) of this rule. The CM unit officer shall make a notation of any unusual occurrences or changes in the inmate's behavior and any action taken. Changes in housing location or any other special action shall also be noted. Form DC6-229 shall be maintained in the housing area for 30 days. After each 30-day review of the inmate by a member of the ICT, Form DC6-229 shall be forwarded to classification to be filed in the institutional inmate record.

(c) A Daily Record of Special Housing – Supplemental, Form DC6-229B, shall be completed and attached to the current Form DC6-229 whenever additional written documentation is required concerning an event or incident related to the specific inmate. Form DC6-229B is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-01970. The effective date of the form is 4-27-08.

(d) An Inspection of Special Housing Record, Form DC6-228, shall be maintained in each CM unit. Each staff person shall sign the record when entering and leaving the CM unit. Prior to leaving the CM unit, each staff member shall indicate any specific problems. No other unit activities will be recorded on Form DC6-228. Upon completion, Form DC6-228 shall be maintained in the housing area and forwarded to the chief of security on a weekly basis where it shall be maintained on file pursuant to the current retention schedule.

(e) A Housing Unit Log, Form DC6-209, shall be maintained in each CM unit. Form DC6-209 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-03419. The effective date of the form is 12/13. Officers shall record all daily unit activities on Form DC6-209, including any special problems or discrepancies noted. The completed Form DC6-209 shall be forwarded daily to the chief of security for review.

(18) Staffing Issues.

(a) Officers assigned to a CM unit shall be reviewed every 18 months by the chief of security to determine whether a rotation is necessary. The chief of security shall review personnel records, including performance appraisals, incident reports, uses of force, and any other documentation relevant to the officer's assignment and job performance; interview the officer and the officer's supervisors for the period of review; and make a recommendation to the warden as to the necessity of a rotation. The warden shall review the recommendation, request additional information, if necessary, and make the final determination as to whether the officer continues in the current assignment or is rotated to another assignment. Any officer assigned to a CM post shall be authorized a minimum period of five days of annual leave or a five-day assignment to a less stressful post every six months.

(b) The Inspector General shall notify the warden and regional director of any officer involved in eight or more use of force incidents in an 18-month period. The regional director shall review the circumstances for possible reassignment.

*Rulemaking Authority 944.09 FS. Law Implemented 944.09 FS. History–New 2-1-01, Amended 12-16-01, 4-8-04, 3-10-05, 4-9-06, 8-23-07, 4-27-08, 6-28-10, 4-6-11, 7-31-11, 1-4-12, 12-9-12, 12-24-13, 3-6-14, 8-17-16, 1-18-21.*