UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

BYRON ANDREWS,

      Plaintiff,

vs.                                                             Case No. 3:23-cv-88-MMH-SJH

SGT. CICCONE, *et al.*

      Defendants.

## PLAINTIFF'S RESPONSE OPPOSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 45)

Plaintiff BYRON ANDREWS, through counsel, files this Response opposing Defendant's Motion for Summary Judgment (Doc. 45), and would show:

### STATEMENT OF DISPUTED AND ADDITIONAL FACTS

Defendant Ciccone offers a highly colored and misleading rendition of the facts pled by Plaintiff. Plaintiff disputes Defendant's assertions and states:

The incident took place at Columbia Annex, N Dorm on May 16, 2021. (Doc. 42-3, Andrews Depo. 9:4-8). Shortly before the incident, Andrews received a disciplinary report from Sgt. Tucker for knocking on the glass window of the dormitory he was in, because he was trying to get the officer's attention due to a medical issue he was having. (*Id.* 12:21-24; 34:7-15). The intercom system was not working. (*Id.* 13:2-5). It was normal for all the inmates if they wanted to get the officer's attention to either wave or knock on the glass. (*Id.* 13:5-7).

Andrews was subsequently placed in hand restraints during count and taken to

1

confinement. (*Id.* 13:12-16). It was "really abnormal" to be taken to confinement while count was in progress. (*Id.* 13:16-17). Andrews was charged with disobeying an order or causing a disturbance, an allegation which Plaintiff contends was fabricated. (*Id.* 13:22-25). He was taken to a holding cell, and Ciccone then removed Andrews from the holding cell and escorted him to Quad 4 of N dorm where he was placed in cell 4213 with Inmate Angel Herrera. (*Id.* 14:13-17). Andrews knew of Herrera from the compound but had never interacted with him. (*Id.* 14:18-21). Andrews knew Herrera was a homosexual by reputation and that he also had a reputation for being violent, for carrying out contracts—"hits"—on other inmates. (*Id.* 14:22-15:3). Andrews had previously witnessed Herrera stab an inmate at Columbia Annex. (*Id.* 14:24-15:1). Coming back from chow one day, Andrews had seen Herrera stab an inmate in "the chute," an entry area where one door does not open until the other door closes. (*Id.* 43:12-22). This area is called the "rat trap" because a lot of stabbing incidents happen there where inmates are locked inside (while both doors are closed). (*Id.* 43:19-22).

On May 16, 2021, when Ciccone brought Andrews to the cell, Herrera said something to the effect that he wasn't supposed to have a cellmate. (*Id.* 15:10-20). Ciccone casually remarked, "I don't care" or words to that effect and placed Andrews in the cell with Herrera. (*Id.* 16:1-5). Andrews was not concerned at first because he assumed Herrera just wanted the cell to himself. He believed that if Herrera was really CM-1 status, he would not be allowed in the cell with Herrera.

(*Id.* 16:6-14). Inside the cell, because Andrews knew Herrera was homosexual, Andrews made it clear he was not. (*Id.* 17:17-22). Herrera said he respected the fact Andrews was not homosexual. (*Id.* 17:22-24). The situation was awkward, and Andrews described the "vibe" as being "kind of off." (*Id.* 18:1-9). Andrews went to sleep. (*Id.* 18:15).

Sometime in the middle of the night, Herrera woke Andrews by tapping his bunk. (*Id.* 18:21-23). Herrera was standing over Andrews with a shank, a homemade knife, referred to as a "poker," a long, thin hard piece of metal sharpened at the end. (*Id.* 18:24-19:2). Andrews sat up, and Herrera told him not to move or he would "hit" or "poke" him (i.e. with the shank). (*Id.* 19:2-6). Herrera then told Andrews to lay back down on his stomach. (*Id.* 19:9-10). Herrera placed a pillow over Andrew's head and told him if he moved he would "hit" him. (*Id.* 19:10-12). Andrews had seen Herrera stab someone before and was afraid he would be stabbed if he did not comply. (*See id.* 19:15-20:20). Andrews was also afraid that if he did manage to get the weapon from Herrera, Andrews could end up with a life sentence for killing Herrera. (*Id.* 19:23-20:11). So Andrews complied. (*Id.* 20:11). Herrera then raped Andrews. (*Id.* 20:12-22).

Afterward Herrera told Andrews he was lucky he didn't stab him because he was supposed to "hit" Andrews, indicating that Andrews was placed in the cell for the purpose of Herrera stabbing or assaulting Andrews. (*Id.* 20:23-21:5, 21:13-18; 26:16-22). Andrews believed the "hit" was placed in retaliation for previously filing a

grievance against a correction officer, J. Manley, who had sprayed and beat an inmate having a seizure. (*Id.* 21:19-22:9).

Andrews had not only filed a grievance against Manley but called the tip hotline against him. (*Id.* 22:10-12). Andrews had subsequently received threats from Sgt. Tucker, whose attention Andrews was trying to get when he knocked on the window, and who initiated the Disciplinary Report against Andrews, which led to his confinement on May 16, 2021. (*Id.* 22:18-23:3). Ciccone knew and sometimes worked with Sgt. Tucker. (Doc. 72-2, Ciccone Depo. 53:4-12). Ciccone also knew Officer Manley, but worked with him infrequently. (*Id.* 55:6-16).[1]

The morning after the rape, Andrews was afraid to tell an officer on the same shift what happened because he had come to believe the situation had been arranged. (Andrews Depo. 23:25-24:13). Andrews was in shock and afraid that if he told the wrong officer anything he would be retaliated against. (*Id.* 27:6-15). He wanted to wait until the next shift arrived before saying anything about the attack. (*Id.* 24:11-13).

That morning, Ciccone came to the cell after breakfast was served and gave some personal food items of his to Herrera, and kind of nodded at Herrera and winked. (*Id.* 24:19-24). Ciccone placed the food items in the cell, which was against prison regulations. (*Id.* 25:1-4). Ciccone dropped off the items through the cell door

---

[1] Even if the actions of Ciccone were not directly motivated by the Manley incident, they were no less violative of the Eighth Amendment in that Ciccone was deliberately indifferent to the risk of harm to Plaintiff that he created.

flap opening. (*Id.* 26:1-7). Andrews concluded that Ciccone must have been paid for the assault. (*Id.* 25:4-6). The food was not items inmates normally received from canteen. (*Id.* 25:11-13). Andrews remembers seeing a Texas cinnamon roll or something like that, something not from the canteen. (*Id.* 25:15-17). The items were those one could get from a vending machine when one goes to the visitation area. (*Id.* 25:17-21). There were a couple of items (not available from the canteen) "like junk food, snack items, stuff like that." (*Id.* 25:20-22). The items were provided after breakfast had been served. (*Id.* 25:23-25).

During the next shift, before Andrews could say anything, Officer Willis came to the cell and told Andrews to submit to hand restraints, to be moved to another cell. (*Id.* 28:13-17). While being escorted, Andrews decided to report the sexual assault incident to Officer Willis. (*Id.* 28:9-10, 18-22). Willis responded to Andrews, "If I was you, I wouldn't say nothing about it" and placed Andrews in a cell in another unit. (*Id.* 28:22-25).

Andrews was placed with an inmate who was purportedly just assaulted by officers. (*Id.* 29:11-13). The inmate had blood stains, was covered in blood, and continually yelled out the cell door that he wanted medical treatment. (*Id.* 29:14-16, 31:11-13). Captain Cooper came to the cell and spoke with the inmate seeking medical attention. (*Id.* 30:11-19). Capt. Cooper was saying that the inmate had gone back on a deal they had. (*Id.* 30:22-25). Andrews told Cooper that he had a PREA allegation to report (i.e., rape). (*Id.* 30:17-22). Capt. Cooper told Andrews that if he

said something about it, the same thing would happen to him as happened to the bloody inmate with whom he was talking. (*Id.* 31:3-13).

When Ciccone placed Andrews with Herrera, Andrews' status was Administrative Confinement (pending disposition of the disciplinary report, i.e., the disciplinary hearing). (Doc. 45-1 at 1, MINS Report, 5/16/21). The subsequent disciplinary hearing took place on May 25, 2021, nine days after the infraction and incident. (*See id.* at 2.). Herrera's status on May 16, 2021 was CMI. (Doc. 72-1, Herrera Depo. 16:11-14; *see also* Doc. 72-5, Herrera Behavioral Risk Assessment at 1).

At his deposition Ciccone testified that Administrative Confinement and Disciplinary Confinement inmates could not be in the same cell together. (Ciccone Depo. 14:20-25). Thus, Defendant Ciccone, acting under color of law, was deliberately indifferent to a substantial risk of serious harm by placing Plaintiff in a cell with an inmate with a violent history who posed a substantial risk of serious harm, who Defendant knew was placed on Close Management I ("CMI") status for acts which "could have caused injury to another." (Doc. 10 at 12).

In sum, weeks earlier, on March 18, 2021, Plaintiff had written a grievance against corrections officer Manley for gassing and physically abusing an inmate who was having a seizure and for placing an anonymous call to the FDC Tips Hotline. (Doc. 72-3, Declaration of Byron Andrews at ¶ 1). Subsequently a retaliatory disciplinary report was filed by Sgt. J.L. Tucker (Doc. 45-1, Andrews Disciplinary Report). Plaintiff was escorted to Confinement on a minor rule violation while

6

Count was still going on, which is extremely rare. An inference could be reasonably drawn that the Disciplinary Report was in retaliation for his grievance. On May 16, 2021, Sgt. Ciccone, who knew Manley and Tucker, placed Plaintiff in a cell with an inmate with a reputation for stabbing inmates, who sexually assaulted Plaintiff at knifepoint. (Doc. 10 at 14, When and Where Claim Arose, ¶ 1). Herrera told Andrews he was lucky he didn't stab him because he was supposed to "hit" Andrews, indicating that Andrews was placed in the cell to be assaulted. (Andrews Depo. 20:23-21:5, 21:13-18; 26:16-22). Sgt. Ciccone gave personal food items from a vending machine to Herrera the next morning and nodded and winked at Herrera. (*Id*. 24:19-24). The responses of Office Willis and Capt. Cooper to Andrews when he told them about the rape indicate an institutional culture of deliberate indifference. (*Id*. 28:22-25, 31:3-13). A jury could reasonably find that Ciccone, as part of that culture, was part of the plan to assault and retaliate against Andrews.

Also, a jury could reasonably find that Sgt. Ciccone, as Dorm Supervisor in N Dorm (confinement) at Columbia Annex, knew Inmate Herrera had been adjudicated as a CMI inmate because Inmate Herrera informed him of that (if Ciccone didn't already know from his records) and that he was incompatible with and represented a serious threat of harm to Plaintiff. (*Id*. at ¶ 2).

Inmate Angel Herrera had a history of stabbing or cutting other inmates. In his deposition he stated he was always placed in Close Management for cutting or stabbing people. (Herrera Depo. 16:17-22; 16:25-17:2; 17:9-10). Herrera could not

remember how many times he ended up in Close Management for cutting people but thought it was three times. (*Id.* 17:14-16). Herrera changed his testimony in his deposition and said that at Columbia, where this incident occurred, he was placed in CM because he was caught with a weapon. (*Id.* 17:22-25; Herrera Doc. 72-7, Disciplinary Charges). He testified, "I never cut nobody in Columbia.  I was going to do it, but they catch me with a weapon on me in my possession of a weapon." (Herrera Depo. 18:3-5). And that is why he was sent to Close Management. (*Id.* 18:6-10). But when told that the Plaintiff claimed he saw Herrera stab someone in the "chute" at Columbia Annex (a location where doors have to close before someone can go in and out) Herrera further contradicted himself and admitted that he stabbed someone in the "chute" at Columbia Annex. (*Id.* 37:10-20). He claimed he cut the individual because that person spat in his face. (*Id.* 37:21-23). Herrera then testified that he was placed in CM in May 2021 for possession of a sharpened toothbrush. (*Id.* 38:14-23). Herrera testified that when he cuts someone, he typically uses a razor. (*Id.* 38:24-39:3). But he also said he used a razor only once, in 2011, when the razor was inside a toothbrush. (*Id.* 39:18-40:18).

At Columbia Annex, Herrera was in CMI. (*Id.* 24:24-25:2; 25:17-19). Herrera had been placed on CMI (aka "CM-1") on April 21, 2021. (Doc. 72-5, Herrera Risk Assessment). Based on his understanding of Close Management, Herrera believed he was supposed to be kept separate from other inmates. (Herrera Depo. 25:3-7: 25:25-26:2). "[I]f I was in CM-1, I was supposed to be in CM-1 by myself." (*Id.* 25:6-7). His placement with Plaintiff on May 16, 2021 was the first time Herrera was placed in

CM-1 with another inmate. (*Id*. 26:8-11). Herrera testified he was surprised that despite being CM-1 another inmate (Plaintiff) was placed in the cell with him. (*Id*. 26:17-20).

The sexual assault was reported by Plaintiff, but his report was never passed on to the Office of Inspector General and there was never a PREA examination or an official investigation.

In housing Plaintiff and Herrera together, Defendant violated 33-601.800, Florida Administrative Code, which includes the provisions that an inmate who caused injury or could have caused injury to another, or who participated in a sexual assault or battery, should be housed alone. *See* Doc. 72-4, 33-601.800(2)(a), Florida Administrative Code (eff. 1/18/21).[2] However, in addition, Inmate Herrera showed a visible disposition to harm Plaintiff if the two were housed together. Plaintiff mentions this not to state a separate cause of action but to help show the subjective awareness of risk of serious harm of Defendant Ciccone.

Also, CMI status mandates single cell housing. F.A.C. 33-601.800(2)(a)(1) (eff. Jan. 18, 2021) ("CM-I is the most restrictive single cell housing level of all the CM status designations."). Herrera's was assigned CMI status on April 1, 2021 (*see* Behavioral Risk Assessment, 6/28/21) and was CMI at the time of the incident (see *id*.). With CMI status, no other prisoner could be placed in the cell with him.

---

[2] Nine of the fifteen provisions mandating CMI housing encompass violence and/or use of force by the inmate. See Doc. 72-4, 33-601.800(2)(a)4.a., b., c., d., e., g., h., k., and m., Florida Administrative Code (eff. 1/18/21), making it probable that a CMI inmate has used violence and/or force.

In addition to his formal corrections training, Defendant Ciccone had special training as a member of the Designated Armed Response Team (DART), which was created for "incident response, disturbance involving multiple inmates." (Ciccone Depo. 15:7-16). DART was armed with lethal and less lethal shotguns. Logically, DART members would be familiar with inmate incompatibility issues.

In his deposition, Inmate Angel Herrera claimed to have a poor memory (Herrera Depo. 12:12-22) and a bad temper (*Id*. 14:13-16). Early in his deposition, Herrera stated, "I'm not even supposed to be over here. I just doing this for Juanita [Villalpando, the Defendant's attorney]. Trying to help Juanita. That's it. That's all I'm doing it for." (*Id*. at 14:24-15:01). Herrera gave the deposition with a corrections officer present. (*Id*. at 15:23-25).

The fact that Defendant provided Plaintiff's cell mate with extra, non-standard food items can raise an inference in a reasonable jury that the cell mate was being rewarded for carrying out abuse. Plaintiff is unaware whether video recordings were retained or reviewed (calling for additional discovery on that issue). Plaintiff further recalls that around breakfast service, Sgt. Ciccone asked Herrera, "Did you hit him?" which is prison language asking whether Plaintiff was stabbed," and followed by, "Is he hurt?" (Doc. 72-3, Declaration of Byron Andrews at ¶ 7). This also demonstrated that Defendant was aware that Herrera had an edged weapon in his possession, and that he had the intention that Plaintiff be physically injured or that he was indifferent to the risk that Plaintiff be injured.

Although Sgt. Ciccone was not the person assigned to choose housing for

inmates, he was aware of the implications of the warning Herrera gave him, responding, "I don't care." (*See* Decl. of Byron Andrews at ¶ 3). Sgt Ciccone also showed an awareness of the risk of harm from Herrera when he asked "Did you hit him?" (*Id*. at ¶ 3) and his approval of the assault by rewarding Herrera with food items he would not have been entitled to.

Inmates on Administrative Confinement ("AC"), such as Plaintiff, are not permitted to be confined with an inmate on CMI status. (Ciccone Depo. 14:20-25). Defendant would not have been able to place Plaintiff with Herrera consistent with his guiding policies and training, given the incompatibility, unless he was deliberately violating the rules in a way that created a risk of harm for Plaintiff.

As the Dormitory Supervisor and senior ranking officer assigned to N Dormitory confinement, Defendant would have known (even if Herrera had not told him) that Herrera was CMI and could not be placed with Plaintiff. Plaintiff concedes that Herrera had originally been confined on Administrative Confinement on March 23, 2021, but was placed on Close Management I on April 1, 2021. (Doc. 72-5, Herrera Behavioral Risk Assessment). Plaintiff was placed on Administrative Confinement (AC) on May 16, 2021, weeks after Herrera had been placed on CMI status.

The Prison Rape Elimination Act (PREA) Incident Report (Doc. 72-6), which was not written until nearly two months after the event, shows that Plaintiff was moved into Herrera's cell on the night shift, not the daytime Administrative Shift, and that he was only left there for a single night, May 16, 2021, before being moved

to a different cell. (*Id.* at 1). No explanation is given for the one-night placement since there was no officially reported incident that could account for Plaintiff's having been moved again the next day, May 17, 2021. (*Id.*).

On December 21, 2021, Sgt. Ciccone was dismissed from his position as Correctional Officer Sergeant for "willful violation of the rules and failure to maintain the proper security and welfare of the institution and inmates" for an incident that involved physical abuse of an inmate that occurred soon after the matter sued upon here. (Doc. 72-8, Alexander Ciccone Dismissal Letter).

## MEMORANDUM OF LAW

The standard is well-settled that summary judgment is authorized only when the moving party establishes that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(c); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). When evaluating a summary judgment motion, the Court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *See Adickes*, 398 U.S. at 157.

The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party must initially "present[] evidence which, if uncontradicted, would entitle it to a directed verdict at trial." *Walker v. Darby*, 911 F.2d 1573, 1576 (11th

Cir. 1990). "Federal Rule of Civil Procedure 56(e) shifts to the non-moving party the burden of presenting specific facts showing such contradiction is possible." *Id.*

An issue is genuine if "a reasonable trier of fact could return judgment for the nonmoving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A self-serving, uncorroborated affidavit can create a genuine dispute of material fact. *United States v. Stein*, 881 F.3d 853, 858 (11th Cir. 2018); but "[c]onclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

## A. Defendant was Deliberately Indifferent to Plaintiff's Rights.

Plaintiff is able to produce evidence from which a Jury could reasonably infer that Defendant Ciccone had knowledge of Inmate Angel Herrera's CMI status, knew the implications of that knowledge, and either instructed or approved of the assault that took place on Plaintiff through his reward of Herrera, as shown by his giving Herrera vending machine items and a wink.

Defendant has sought summary judgment on Plaintiff's claim charging deliberate indifference to the risk of harm at the hands of a hostile inmate with a history of violence toward other inmates. "A prison official's 'deliberate indifference'

to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citations omitted). Accordingly, a prison inmate has a constitutional right to be protected from violence and from physical assault by other inmates. *Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir. 1984) (per curiam); *Gullatte v. Potts*, 654 F.2d 1007, 1012 (5th Cir. Unit B Aug. 1981). When officials become aware of a threat to an inmate's health and safety, the Eighth Amendment imposes a duty to provide reasonable protection. *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (noting that when prison officials are "deliberately indifferent to a known danger, . . . their failure to intervene offend[s] 'evolving standards of decency' [and] ris[es] to the level of a constitutional tort.'"). See *McCreary v. Brevard County*, *Florida*, No. 6:09-cv-1394-Orl-19DAB, at *10 (M.D. Fla. June 18, 2010) ("At the time of the attack, McCreary had a clearly established right to protection from Corrections Officials who possessed actual knowledge that Evans posed a substantial risk of serious harm to McCreary."); The Eighth Amendment "imposes a duty on prison officials" to "take reasonable measures to guarantee the safety of the inmates." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099-1100 (11th Cir. 2014). "Prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Purcell ex rel. Estate of Morgan v. Toombs County*, 400 F.3d 1313, 1319 (11th Cir. 2005) (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)).

Reckless disregard of Plaintiff's right to be free from attacks by another inmate may be shown by the existence of "'a pervasive risk of harm to inmates from other prisoners'" and a failure by prison officials to reasonably respond to that risk. *Withers*

*v. Levine*, 615 F.2d 158, 161 (4th Cir.), cert. denied, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980) (quoting *Woodhous v. Com. of Virginia*, 487 F.2d 889, 890 (4th Cir. 1973)). *Abrams v. Hunter*, 910 F. Supp. 620, 624 (M.D. Fla. 1995) "To survive summary judgment on a deliberate indifference failure-to-protect claim, 'a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) deliberate indifference to that risk; and (3) causation.'" *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013)); see also *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016) quoting *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995).

If a substantial risk of serious harm exists, the inquiry turns to the second element, which is sometimes referred to as the "deliberate indifference" element of the overall Eighth Amendment claim. *Rodriguez v. Secretary for Department of Corrections*, 508 F.3d 611, 617 (11th Cir. 2007); *Caldwell*, 748 F.3d at 1099. ("The second element—the defendant's deliberate indifference to that risk—has two components: one subjective and one objective."); *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320-21 (11th Cir. 2016). A prison official acts with deliberate indifference "when he actually (subjectively) knows that an inmate is facing a substantial risk of serious harm, yet disregards that known risk by failing to respond to it in an (objectively) reasonable manner." *Rodriguez*, 508 F.3d at 617.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from

circumstantial evidence." *Bowen*, 826 F.3d at 1321 (citing *Farmer*, 511 U.S. at 842). "The trier of fact may . . . 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Farmer*, 511 U.S. at 842).

"An official responds to a known risk in an objectively unreasonable manner if 'he knew of ways to reduce the harm but knowingly declined to act' or if 'he knew of ways to reduce the harm but recklessly declined to act.'" *Rodriguez*, 508 F.3d at 619-20 (quoting *Hale v. Tallapoosa County*, 50 F.3d 1579, 1583 (11th Cir. 1995)).

Here, Ciccone knew that an Administrative Confinement inmate (Andrews) and a Close Management inmate (Herrera) were not supposed to be housed together. (Ciccone Depo. 14:20-25). Yet Ciccone violated protocol. And his subsequently rewarding Herrera and nodding and winking at him underscores his prior deliberate indifference to Andrews' welfare, when he placed Andrews in the cell with Herrera.

**B. Plaintiff Does Not Assert a Claim Based on the Fla. Administrative Code**

Here, Defendant violated Florida Administrative Code 33-601.800 when he placed Plaintiff in a cell with an inmate whose CMI status mandated the most restrictive single cell housing. Defendant's deliberate indifference when he placed Plaintiff in the cell is further corroborated by Defendant's asking Herrera the next morning, "Did you hit him?" and "Is he hurt?" and by his providing Herrera with food the next morning, when the Canteen was not operating. Plaintiff does not argue that a rule violation is equivalent to a violation of the U.S. Constitution, but rather to support the inference that Ciccone had subjective knowledge of the risk of harm. *See Stewart v. Johnson*, No. 5:18-CV-37, 2021 WL 3081882, at *3 (S.D. Ga. July 21, 2021)

("evidence of a policy violation may be evidence of deliberate indifference"); *Hope v. Pelzer*, 536 U.S. 730, 743-44 (2002) (holding that official's disregard of prison regulation "provides equally strong support for the conclusion that they were fully aware of the wrongful nature of their conduct.")

Plaintiff does refer to the Fla. Administrative Code violation but not as an independent action but rather to show knowledge and deliberate indifference. The Code section 33-601.800 begins with the following:

(1) Definitions.

(a) Close Management (CM) – the separation of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, when the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others.

(b) Close Management Levels – the three individual levels (CMI, CMII, and CMIII) associated with CM, with CMI being the most restrictive single cell housing level and CMIII being the least restrictive housing of the three CM levels.

Close Management has a goal to protect inmates, among others. The failure of prison officials to control or separate prisoners who endanger the physical safety of other prisoners may, under certain conditions, constitute an Eighth Amendment deprivation. *Smith v. Wade*, 461 U.S. 30 (1983). Prison classification systems are "remedies employed to eradicate abuses that were themselves unconstitutional. For example, when prison officials have failed to control or separate prisoners who endanger the physical safety of other prisoners, and the level of violence becomes so high as to constitute cruel and unusual punishment under the Eighth Amendment."

17

*Jones v. Diamond*, 594 F.3d 997, 1015 (5th Cir. 1979). A failure to segregate inmates based on their propensity for violence can form the basis of a claim for a violation of a constitutional right. See *Marsh v. Butler County*, 268 F.3d 1014, 1029 (11th Cir. 2001); *Hale v. Tallapoosa County*, 50 F.3d 1579, 1581-84 (11th Cir. 1995).

A prisoner has a right to be protected from the constant threat of violence and from sexual assault. When prison officials have failed to control or segregate prisoners who endanger the physical safety of other prisoners, resulting in a high level of violence, it constitutes cruel and unusual punishment. *Jones v. Diamond*, 636 F.2d 1364, 1373-74 (5th Cir.) (en banc), cert. dismissed, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981); see also *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) ( Eighth Amendment ban on cruel and unusual punishment made applicable to states by Fourteenth Amendment due process clause). *LaMarca v. Turner*, 662 F. Supp. 647, 662-63 (S.D. Fla. 1987). In this case, the inmate with whom Plaintiff was housed was to have been segregated based on his "inability to live in the general population without abusing the rights and privileges of others," which was verbally acknowledged by Defendant at the time of Plaintiff's placement in the cell.

## C. Plaintiff's Claim Is Based on Clearly Established Law

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

18

*Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)) (alterations and internal quotation marks omitted). "Qualified immunity from suit is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Id.* (citation and internal quotation marks omitted).

Violent assaults in prison are not "part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). "It is well settled that `[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995) (quoting *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)). It is well-settled that a prison official's "deliberate indifference" to a substantial risk of serious harm to an inmate violates the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25 (1993); *Estelle v. Gamble*, 429 U.S. 97 (1976). Prison administrators "are under an obligation to take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984). Specifically, prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). If a prisoner puts prison officials on notice that he is at risk of harm from other prisoners, and then suffers a harm that could have been prevented by reasonable measures, officials may be held liable.

An Eighth Amendment violation for deliberate indifference to safety occurs when (1) there exists a substantial, particularized threat or fear of serious harm, (2) of which a defendant is subjectively aware, and (3) the defendant does not respond reasonably to the risk. *Rodriguez v. Sec'y for the Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007); *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).

A prison official violates the Eighth Amendment in this context of inmate-on-inmate violence "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Caldwell v. Warden, FCI Talledega*, 748 F.3d 1090, 1098 (11th Cir. 2014).

"The applicable law is clearly established if [it] dictates, that is, truly compel[s], the conclusion for all reasonable similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances." *Evans v. Stephens*, 407 F.3d 1272, 1282 (11th Cir. 2005) (en banc) (internal quotes omitted). Thus, "official conduct may be so egregious that further warning and notice beyond the general statement of law found in . . . the caselaw is unnecessary. . . ." *Willingham v. Loughnan*, 321 F.3d 1299, 1302 (11th Cir. 2003).

This duty is such that an official's "deliberate indifference" to an inmate's "substantial risk of serious harm" at the hands of another inmate violates the Eighth Amendment. *Farmer* at 828.

Here, F.A.C. 33-601.800 clearly established that CMI status constituted "the most restrictive single cell housing level of all the CM status designations," where the majority of provisions mandating CMI status involved the inmate's prior use of

violence and/or force. See F.A.C. 33-601.800(2)(a)1. and 4.a., b., c., d., e., g., h., k., and m. (eff. 1/18/21) (emphasis added). Defendant's placing Plaintiff in the single cell with Herrera, a CMI inmate, *per se* violated the F.A.C.

### D. Defendant's Motion to Dismiss Punitive Damages Lacks Merit.

Defendant's argument that punitive damages are barred by 18 U.S.C. § 3626(a)(1)(A) lacks merit for reasons explained in many opinions. *See Smith v. Williams*, 3:23-CV-5661/TKW/ZCB, 2024 WL 4438320, at *5 (N.D. Fla. Sept. 9, 2024), report *and recommendation adopted*, 2024 WL 4434798 (N.D. Fla. Oct. 7, 2024) (citing *Blake v. Ortega*, No. 3:23-cv-8553/LC/HTC, 2024 WL 2000107, at *4 (N.D. Fla. Mar. 18, 2024), *adopted by* 2024 WL 1996014 (May 6, 2024); *Santiago v. Walden*, No. 3:23cv741/MMH/JBT, 2024 WL 2895319, at *9 (M.D. Fla. June 10, 2024); *Walker v. Bailey*, No. 3:23-cv-511/MMH/MCR, 2024 WL 3520868, at *8 (M.D. Fla. July 24, 2024)).

"The current state of the law does not support the conclusion that section 3626 imposes a categorical prohibition on an award of punitive damages." *Blake*, 2024 WL 2000107 at *4.

Plaintiff adopts wholesale Judge Marcia Morales Howard's reasoning in *Santiago*, 2024 WL 2895319 at *8–9 (declining to dismiss punitive damages request):

Defendant argues that Andrews' request for punitive damages must be

dismissed because it is statutorily barred. (Doc. 45 at 17). According to

Defendant, 18 U.S.C. § 3626(a)(1)(A) precludes punitive damages in all civil

rights cases because such damages constitute "prospective relief." *Id*. at 17-18.

In support of this contention, Defendant asserts that punitive damages "are

never necessary to correct a violation of a federal right." *Id*. at 18. Defendant

also contends that even if an award of punitive damages is necessary to correct

such a legal violation, that award could not satisfy the PLRA's "stringent

limitations" as the relief is neither "narrowly drawn" nor "the least intrusive

means necessary to correct the violation of the Federal right." *Id*. at 18.

Plaintiff, however, argues that his request for punitive damages is not

statutorily barred but necessary to compensate him for Defendant's actions.

> Section 3626(a)(1)(A) provides:

> (1) Prospective relief. – (A) Prospective relief in any civil
> action with respect to prison conditions shall extend no
> further than necessary to correct the violation of the Federal
> right of a particular plaintiff or plaintiffs. The court shall not
> grant or approve any prospective relief unless the court finds
> that such relief is narrowly drawn, extends no further than
> necessary to correct the violation of the Federal right, and is
> the least intrusive means necessary to correct the violation of
> the Federal right. The court shall give substantial weight to
> any adverse impact on public safety or the operation of a
> criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). Defendant is correct that punitive damages are

considered "prospective relief" under § 3626. *See Johnson v. Breeden*, 280 F.3d

1308, 1325 (11th Cir. 2002) (holding "punitive damages are prospective relief"), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015)). But Defendant's argument that punitive damages, as "prospective relief" under § 3626, are precluded in prisoner civil rights actions is wholly misplaced. *See Santiago*, 2024 WL 2895319 at *8. Indeed, Defendant cites *Johnson* as his primary support for this notion; but in *Johnson*, the court did not hold that punitive damages were unavailable under § 3626 for § 1983 cases. Instead, in *Johnson*, the Eleventh Circuit clarified, in the context of a § 1983 civil rights case, that § 3626(a)(1)(A) merely provides the framework for awarding punitive damages. *Johnson*, 280 F.3d at 1325. It explained "a punitive damages award must be no larger than reasonably necessary to deter the kind of violations of the federal right that occurred in the case...[and] that such awards should be imposed against no more defendants than necessary to serve that deterrent function and that they are the least intrusive way of doing so." *Id*.

No Eleventh Circuit case has addressed Defendant's specific argument here. *See Santiago*, 2024 WL 2895319 at *9. The Court cannot disregard the Eleventh Circuit's long-standing recognition that punitive damages are available in prisoner civil rights actions. *Id*. Indeed, the Eleventh Circuit has held that 42 U.S.C. § 1997e(e) permits claims for punitive damages for § 1983

claims without a physical injury requirement. *Hoever v. Marks*, 993 F.3d 1353, 1364 (11th Cir. 2021).[3] And it has held "(p)unitive damages are appropriate in § 1983 cases 'where a defendant's conduct is motivated by evil intent or involves callous or reckless indifference to federally protected rights." *Barnett v. MacArthur*, 715 F. App'x 894, 905 (11th Cir. 2017). Also, the Eleventh Circuit Civil Pattern Jury Instructions on § 1983 damages include an instruction on awarding punitive damages. *See* Eleventh Circuit Pattern Jury Instruction, Civil Cases, Civil Rights – 42 U.S.C. § 1983 Claims – Damages § 5.13.

Also persuasive are other district court decisions explicitly finding that § 3626(a)(1)(A) does not preclude an award of punitive damages in prisoner civil cases. *Santiago,* 2024 WL 2895319 at *9 (citing *e.g.*, *Brown v. Semple*, No. 3:16-cv-376, 2018 WL 4308564, at *14 (D. Conn. Sept. 10, 2018) (collecting cases); *Douglas v. Byunghak Jin*, No. 11-0350, 2014 WL 1117934, at *4-5 (W.D. Penn. Mar. 20, 2014) (reasoning that if Congress "intended to abolish punitive damages in all prisoner litigation under the PLRA, it would have done so directly, and in much plainer terms")). Thus, as in *Santiago*, this Court should decline to find that § 3626 precludes a request for punitive damages in this § 1983 action, and should deny Defendant's Motion.

---

[3] In *Hoever*, the Eleventh Circuit declined to address the availability of punitive damages in prison condition cases under 18 U.S.C. § 3626. *Hoever*, 993 F.3d at 1364 n.5.

WHEREFORE, Plaintiff asks this Honorable Court to DENY Defendant's

Motion for Summary Judgment.

Respectfully Submitted,

| | |
|---|---|
| */s/ Joshua Tarjan* | *s/James V. Cook* |
| Joshua Tarjan (FBN 107092) | James V. Cook, Esq., FBN 0966853 |
| The Tarjan Law Firm P.A. | Law Office of James Cook |
| 12372 SW 82 Avenue | 314 West Jefferson Street |
| Pinecrest, FL 33156 | Tallahassee, Florida 32301 |
| (305) 423-8747; (786) 842-4430 fax | (850) 222-8080; 850 561-0836 fax |
| josh@tarjanlawfirm.com | cookjv@gmail.com |
| | |
| *Attorney for Plaintiff* | *Attorney for Plaintiff* |

I CERTIFY the foregoing was filed electronically on 4/28/25 and served on all counsel registered with the CM/Doc. electronic mail system:

*/s/ Joshua Tarjan*

25