UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

BYRON ANDREWS,

        Plaintiff,

v.                             Case No. 3:23-cv-88-MMH-SJH

SGT. CICCONE,

        Defendant.

_____

### **ORDER**

### **I. Status**

Plaintiff Byron Andrews, an inmate in the Florida Department of Corrections (FDC) who is proceeding as a pauper, initiated this case by filing a pro se Civil Rights Complaint pursuant to 42 U.S.C. § 1983 (Doc. 1). He filed an Amended Complaint (Doc. 10; Amended Complaint) which is the operative pleading in the case. Defendant Sergeant Ciccone is the only remaining Defendant named in the Amended Complaint.[1]

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 45; Motion) with exhibits (Docs. 45-1 to 45-6). The Court

---

[1] On April 24, 2023, the Court dismissed Andrews's claims against Defendants Herring, Inch, and Dixon. See Order (Doc. 11). Thus, Sergeant Ciccone is the only remaining Defendant.

advised Andrews of the provisions of Rule 56, Federal Rules of Civil Procedure (Rule(s)), notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and permitted him an opportunity to respond to the Motion. See Order (Doc. 12); Summary Judgment Notice (Doc. 46). Before Andrews's time to respond expired, counsel appeared on Andrews's behalf. See Notice of Appearance (Doc. 49). After the Court allowed the parties to engage in some additional discovery, see Orders (Docs. 55, 58, 71), Andrews, through counsel, filed a Response Opposing Defendant's Motion for Summary Judgment (Doc. 73; Response) with exhibits (Docs. 72-1 to 72-8). Defendant filed an Amended Reply and Objections to Andrews's Response (Doc. 83; Reply) with exhibits (Docs. 83-1 to 83-7). And with the Court's leave, Andrews filed a counseled Sur-Reply (Doc. 89; Sur-Reply). The Motion is ripe for review.

## II. Andrews's Allegations[2]

In the Amended Complaint, Andrews alleges that on May 16, 2021, at Columbia Correctional Institution Annex, Defendant Ciccone housed him "inside of the same cell with a[] hostile inmate [(Angel Herrera)] who sexually

---

[2] For the purposes of resolving Defendant's Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to Andrews. However, the Court notes that these facts may differ from those that ultimately can be proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

assaulted him" while in possession of a homemade knife. Amended Complaint at 14, 19. Andrews contends that Defendant, as the dorm supervisor, acted with deliberate indifference as he "was directly responsible for classify[ing] and housing all inmates" in the dorm in which the incident occurred. Id. at 14. According to Andrews, Defendant knew of the other inmate's close management level I (CMI) status "and that he posed a substantial risk of causing serious harm to other inmate[s] based on his violent history towards other inmates." Id. The day after the assault, Andrews contends that Defendant can "be seen on cam[e]ra placing personal food items inside of cell-4213 to" the inmate who assaulted Andrews. Id. at 19.

### III. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P.

56(c)(1)(A).[3] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

---

[3] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal quotation marks and citations omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Guevara v. NCL (Bahamas) Ltd., 920 F.3d 710, 720 (11th Cir. 2019) (internal quotation marks and citation omitted).

## IV. Summary of the Arguments

### A. Defendant's Position

Defendant argues the following: (1) Andrews cannot prove a constitutional violation; (2) Defendant is entitled to qualified immunity; and (3) Andrews's request for punitive damages is statutorily barred. See Motion at 6–24. In support of his arguments, Defendant submits a copy of a disciplinary report Andrews received on May 16, 2021, which led to Andrews's placement in administrative confinement (Doc. 45-1); the Declaration of Christina Crews, Assistant Warden of Programs at Columbia Correctional Institution (Doc. 45-2); Defendant's shift assignment on May 16, 2021 (Doc. 45-3); Inmate Angel Herrera's Daily Record of Special Housing form between May 16, 2021, and May 22, 2021, showing Herrera was assigned to administrative confinement (Doc. 45-4); copies of Andrews's relevant grievances and responses thereto (Doc. 45-5); the Declaration of Angela Carter, an FDC Correctional Program Administrator (Doc. 45-6); Andrews's deposition transcript (Doc. 83-1); the Declaration of Carl Wesley Kirkland, Jr., an FDC Deputy Director of Institutional Operations (Doc. 83-2); the Control Room Log from May 16, 2021 (Doc. 83-3); a Chest Pain Protocol form and a Pre-Special Housing Health Evaluation form completed at 6:30 p.m. on May 16, 2021, for Andrews (Doc. 83-4); a document showing the times Defendant clocked in and out on May 16,

2021, and May 17, 2021 (Doc. 83-5); Inmate Angel Herrera's Order History

Report from May 1, 2021 through May 31, 2021, and his Inmate Trust Account

transactions from May 5, 2021 through October 25, 2021 (Doc. 83-6); and

Andrews's Daily Record of Special Housing form dated May 16, 2021 to May

24, 2021 (Doc. 83-7).

Ms. Carter avers as follows:

> Close management is the separation of an
> inmate apart from the general population, for reasons
> of security or the order and effective management of
> the institution, when the inmate, through his or her
> behavior, has demonstrated an inability to live in the
> general population without abusing the rights and
> privileges of others.

> Being placed on CM alone is not indicative that
> an inmate is dangerous or violent towards other
> inmates. Acts that result in CM review are acts that
> threaten the safety of others, threaten the security of
> the institution, or demonstrate an inability to live in
> the general population without abusing the rights and
> privileges of others.

> Placement on CMI is not synonymous with an
> inmate being dangerous or violent towards other
> inmates. Per Chapter 33-601.800(2), there are various
> actions that constitute a basis for placement on CMI.
> The actions need not have resulted in harm to other
> inmates. These actions include but are not limited to
> trafficking in drugs, an escape or escape attempt from
> a secure perimeter, and/or creating or causing
> property damage in excess of $1,000.

> CMI status alone does not provide notice to
> correctional officers that the inmate is violent. It only

provides notice that the inmate has demonstrated an inability to live in general population without abusing their rights and privileges, or that of others, whether that may be correctional officers, or other inmates. Such inmates prevent staff from managing the institution efficiently, which can result in security issues.

I was asked by the Florida Office of the Attorney General to review the file of Inmate Angel Herrera . . . to determine whether Inmate Herrera was involved in an attack on an inmate at Columbia Correctional Institution—Annex.

Upon review of Inmate Herrera's file, there is no record of any such attack.

Further, there is no indication Inmate Herrera has any gang affiliation.

Doc. 45-6 at 1–2 (paragraph enumeration omitted).

Ms. Crews describes "the customary procedure regarding the authorization of a cell assignment of an inmate when he is moved to confinement housing following a Disciplinary Report." Doc. 45-2 at 1. She clarifies that she "do[es] not have personal knowledge of the alleged incident" at issue, but she "explain[s] the procedure that was in place and utilized in 2021 and is still used today." Id.

When an inmate is given a Disciplinary Report, he is separated from the general population and placed in administrative confinement pending a disciplinary hearing.

8

First, the Officer in Charge "OIC" is contacted for approval to move the inmate to confinement housing. Once the OIC authorizes the inmate's placement in confinement housing status, officers will escort the inmate to a confinement dormitory.

Once the inmate is in the confinement dormitory, the inmate is placed in a holding cell while he is given a cell assignment within the dormitory.

When this occurs on a weekend, or after 5 p.m. on a weekday, the institution's control room staff is responsible for issuing housing assignments for all inmates. A housing assignment includes cell and bunk assignments.

The control room uses the Housing Integrated Assessment and Placement System to screen inmates. The system checks the compatibility of two inmates that are to be housed together. Several factors are taken into consideration such as an inmate's height, weight, confinement status, and protection needs, etc. If the inmates are not compatible, the inmates will not be housed together.

Once the control room determines that the inmate can be housed in a certain cell, they contact the confinement dormitory's officers and provide a housing assignment.

Columbia Correctional Institution – Annex is not designated as a close management institution and therefore does not have a designated close management unit. When an inmate at Columbia Correctional Institution – Annex is approved to be placed in close management, he is housed in confinement only until he can be transferred when a housing assignment becomes available at a correctional institution that is designated as a close management institution.

Id. at 1–2 (paragraph enumeration omitted).

Mr. Kirkland avers, in pertinent part, as follows:

> Housing assignments are completed by the Security Department in accordance with the Inmate Behavioral Assessment Scale ("IBAS"), to ensure compatibility.

> Today, IBAS has a restriction that prevents inmates that have a team decision approving [CMI] status from being housed with other inmates. The system will automatically block the placement of another inmate in the cell that houses a CMI status inmate and force the person making the data entry to find another cell.

> In May 2021, IBAS did not have the automatic block in place that would have prevented a non-CM inmate from being housed in the same cell with a CM inmate.

> Columbia Correctional Institution – Annex is not designated as a CM institution, which means that it does not house CM inmates long-term. Beds in non-CM institutions are designated as administrative confinement bed[s] and not CM beds.

> Inmates that are approved for CM in non-CM institutions are housed in administrative confinement while a CM bed becomes available in an institution that houses CM inmates, and he can be transferred. While the CM status inmate waits to be transferred, he will continue to be housed in administrative confinement, but he will be receiving credit for being on CM.

> In a non-CM institution, confinement staff manage the security of CM inmates like other

confinement inmates. CM status inmates are not engaging in CM activities and programs while assigned to an administrative confinement bed in an institution that is not designated as a CM institution. The team decision approving CM status only triggers special reviews that are required for CM inmates.

Before the update to the system, dormitory staff in the confinement unit may not have been aware that an inmate was approved for CMI. Dormitory staff were alerted of an inmate's CM status by notations in the inmate's DC6-229[4] and/or a placard on the cell door stating that there was a team decision approving CM status.

Doc. 83-2 at 1–2 (paragraph enumeration omitted).

## B. Andrews's Position

Andrews argues that he "is able to produce evidence from which a [j]ury could reasonably infer that Defendant Ciccone had knowledge of Inmate Angel Herrera's CMI status, knew the implications of that knowledge, and either instructed or approved of the assault that took place on Andrews through his reward of Herrera, as shown by his giving Herrera vending machine items and a wink." Response at 13. In support, Andrews submits a copy of Inmate Herrera's deposition transcript (Doc. 72-1); a copy of Defendant's deposition transcript (Doc. 72-2); Andrews's Declaration (Doc. 72-3); a copy of Florida Administrative Code rule 33-601.800, which refers to CMI as "the most

---

[4] The DC6-229 form is the Daily Record of Special Housing form.

restrictive <u>single cell</u> housing level of all the CM status designations" (Doc. 72-4 at 2) (emphasis added); Inmate Herrera's Behavioral Risk Assessment completed on June 18, 2021, which shows that Herrera was assigned to CMI on April 1, 2021 (Doc. 72-5); an Incident Report dated July 8, 2021, documenting Andrews's report of Herrera's alleged assault (Doc. 72-6); a Disciplinary Report for Inmate Herrera dated March 23, 2021 (Doc. 72-7); and a letter dismissing Defendant from his employment with FDC dated December 21, 2021 (Doc. 72-8).

In Andrews's Declaration, he avers in pertinent part:

> On March 18, 2021, I wrote a grievance on corrections officers for gassing and physically abusing an inmate who was having a seizure. I also placed an anonymous Call to the Tips Hotline. Thereafter, I received threats for filing grievances. Dorm Sgt. J.L. Tucker announced that inmates who filed grievances would be "dealt with." I continued to file grievances relating to the abuse although they were not returned.

> On May 16, 2021, after filing the last grievance, I was told there were orders not to feed me. I was told to "cuff up" and I was taken to Dorm Sgt. Tucker. He had written me a disciplinary report for Disorderly Conduct for knocking on the glass at the Officer's Station. I was escorted to confinement by Tucker while count was still going on - which was rare, especially for a minor violation.

> Once I was in confinement, Sgt. Ciccone took me to Cell N4213, the cell of Inmate Angel Herrera. As Ciccone was about to place me in the cell, Herrera said something about being on "house alone" status. With

that warning, there should have been an inquiry before I was placed there. Ciccone replied, "I don't care."

Inmate Herrera seemed somewhat hostile to me. He asked me several questions while ignoring my questions. He wanted to know why Tucker had problems with me. He wanted to know what I had done to be placed in confinement. He asked if I was gay. I told him that I was not. I knew Herrera by reputation - that he was homosexual and took contracts to "hit" (usually stab) other inmates. I didn't think I would have a problem with him and I didn't object to the placement.

Sometime during the night, Herrera woke me up. He was standing next to me with a homemade knife. He told me to lie back down on my stomach. He put a pillow over my head. He penetrated me anally. Later, he told me I was lucky that was all he did. He said, "I was supposed to 'hit' you," (which [is] prison language for a stabbing), but he decided to rape me instead. I later saw him stab someone.

I concluded that I was set up for a hit by Officer Tucker who passed me to Ciccone who placed me with Inmate Herrera because I filed a grievance on Ofcr. J. Manley for beating and gassing an inmate who was having a seizure. It was pretty bad. I received threats from Sgt. Tucker who passed me on to Ciccone.

The next morning, May 17, 2021, after breakfast, I saw Sgt. Ciccone passing personal (non-official) food items to Inmate Herrera. Herrera later told me that was a reward for assaulting me. I heard Sgt. Ciccone ask Herrera, "Did you hit (stab) him?" Ciccone added, "Is he hurt?"

Later that morning, between 10:00 a.m. and 12:00 p.m., Officer Willis took me to a different quad.

13

I told Willis that Herrera had raped me. Willis told me,
"If I was you, I wouldn't say nothing about it." It
appeared that he knew what was going on and my
placement with Herrera served its purpose. I was
placed in another unit. The cell I was placed in had an
inmate, I think his name was Reid, [who] was
bleeding. I understood [he] had been beaten up by
officers. Captain Cooper was present.

I reported the sexual assault to Capt. Cooper. He
said that if I say anything about it, the same thing will
happen to me, indicating my cellmate who was covered
in blood. I reported it to Ofcr. Willis and a counselor
named Stirley and a lot of others. I tried to call the TIP
Hotline but it wasn't working. There was never a
PREA examination or PREA investigation. Instead, I
was charged with "refusing" to cooperate with an
investigation, which is false.

In placing me with Herrera, Defendant violated
33-601.800, Florida Administrative Code, which
includes the provisions that an inmate who caused
injury or could have caused injury to another, or who
participated in a sexual assault or battery, should be
housed alone. 33-601.800(2)(a)b-m, Florida
Administrative Code (eff. 1/18/21). However, in
addition, Inmate Herrera showed a visible disposition
to harm me if we were housed together.

The fact that Ciccone provided my cell mate with
special food items further suggests my cell mate was
being rewarded for abusing me. I am not aware
whether video recordings were retained or reviewed.
Herrera had an edged weapon in his possession, which
was the same offense he was placed on CM 1 for.

Afterwards, Herrera acknowledged to me that
the food items were partial payment for carrying out
an assault on me and that he had been instructed to

14

stab me, but that Herrera chose to sexually assault me instead.

Defendant may claim that the food items were simply ordered canteen items but if that were true, there would be a canteen order form. The canteen order forms are signed again after distribution of the canteen items by the canteen operator. The date the items were provided was not a canteen day. Finally, the items were not items that prisoners were allowed to purchase.

Sgt. Ciccone was aware of the implications of the warning Herrera gave him responding, "I don't care." Sgt Ciccone also showed an awareness of the risk of harm from Herrera when he asked "Did you hit him?" and his approval of the assault by rewarding Herrera with food items he would not have been entitled to.

Chapter 33 does not permit inmates on Administrative Confinement (AC), such as [Andrews], to be confined with an inmate on CMI status. Defendant would not have been able to place [Andrews] with Herrera consistent with his guiding policies and training, given the incompatibility, unless he was deliberately violating the rules in a way that created a risk of harm for [Andrews].

As the Dormitory Supervisor and senior ranking officer assigned to N Dormitory confinement, Defendant would have known, even if Herrera had not told him, that Herrera was CM-I and could not be placed with me. Herrera had originally been confined on AC confinement on March 23, 2021, but was placed on Close Management on March 31, 2021. I was placed on Administrative Confinement (AC) on May 16, 2021, 45 days after Herrera had been placed on CMI status.

Doc. 72-3 at 1–4 (paragraph enumeration omitted).

## V. Defendant's Objections

Defendant objects to the following evidence submitted by Andrews: (1) Defendant's Dismissal Letter (Doc. 72-8); and (2) Andrews's Declaration (Doc. 72-3). Although Andrews filed a Sur-Reply, he did not address Defendant's objections.

Andrews filed a letter dated December 21, 2021, from the FDC addressed to Defendant, in which FDC advises Defendant that it was dismissing him from his position as a correctional officer sergeant effective December 27, 2021 (Doc. 72-8). Andrews contends that the dismissal letter resulted from "an incident that involved physical abuse of an inmate that occurred soon after the matter sued upon here." Response at 12. Other than referencing the letter one time in his statement of facts, Andrews does not otherwise rely on the letter to support his position, and the Court finds it wholly unrelated to the issue before it on summary judgment. Thus, the Court sustains Defendant's objection to the letter for purposes of the summary judgment ruling.

Defendant also objects to specific portions of Andrews's Declaration "due to [Andrews] asserting facts which were not addressed during and are contradictory to his deposition." Reply at 1. Defendant also raises a "hearsay" objection to Andrews's statement "that Herrera told him that he [(Herrera)] had been instructed to assault [Andrews]." Id. at 2.

16

With the exception of the "hearsay" objection, Defendant does not cite any legal authority supporting his objections or otherwise address the legal theory under which he objects to Andrews's Declaration. The Court assumes he objects to Andrews's Declaration based on the "sham affidavit rule."

> A court may determine that an affidavit is a sham when it contradicts previous deposition testimony and the party submitting the affidavit does not give any valid explanation for the contradiction. See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656 (11th Cir. 1984). However, "[t]his rule is applied sparingly because of the harsh effect it may have on a party's case." Allen v. Bd. of Pub. Educ. for Bibb Cmty., 495 F.3d 1306, 1316 (11th Cir. 2007). As such, courts must "find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." Id.

Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1237 (11th Cir. 2010). Notably, the Eleventh Circuit has instructed, "[a] definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." Tippens v. Celotex Corp., 805 F.2d 949, 953 (11th Cir. 1986). Indeed, "[a]n affidavit may only be disregarded as a sham when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously

17

given clear testimony." Id. at 954 (internal quotation marks and citation
omitted).

Here, Defendant first objects to Andrews's statements in his Declaration
that before the assault, Herrera "asked him 'why Tucker had problems with
[him],'" and after the assault, "Herrera told [Andrews] that the food items were
a 'reward' for assaulting [Andrews]." Reply at 1–2 (quoting Doc. 72-3 at 2).
Defendant argues that these statements contradict Andrews's prior deposition
testimony.

The statement in Andrews's Declaration regarding "Tucker" describes a
conversation that occurred before the assault; thus, it is not contradictory to
Andrews's response in his deposition to the question of what Herrera said after
the assault. As to the "reward" statement, Andrews avers in his Declaration
that "[t]he next morning, May 17, 2021, after breakfast, [he] saw Sgt. Ciccone
passing personal (non-official) food items to Inmate Herrera. Herrera later told
[Andrews] that was a reward for assaulting [him]." Doc. 72-3 at 2. At Andrews's
deposition, Andrews was discussing the timeframe of when Defendant
allegedly dropped off food items to Herrera the morning after the assault. See
Doc. 83-1 at 24–26. Then the following exchange occurred:

> Q. All right. Did Angel Herrera say anything to you?
>
> A. At that point?

18

Q. After the sexual assault.

A. Like, all he told me was I'm lucky that that - - that's all he did, and that he was supposed to hit me and <u>that's it</u>.

Q. All right. And then what happened next? . . . Let me - - let me rephrase that.
Were you in pain?

<u>Id.</u> at 26–27 (emphasis added). Defendant emphasizes that Andrews said, "that's it." Reply at 2. But Andrews's statement could be interpreted as Herrera was supposed to hit Andrews and "that's it." Or it could be interpreted, as Defendant apparently does, that Herrera never said anything else to Andrews. Moreover, counsel's line of questioning at Andrews's deposition appears to reflect that she was asking Andrews if Herrera said anything to him immediately after the assault. And Andrews's statement about the "reward" is referring to sometime following Herrera's alleged receipt of food the next morning. Although Andrews did not mention during his deposition that Herrera said the food was a "reward," the Court does not find his statements in his Declaration and deposition to be inherently inconsistent. Thus, the Court declines to apply the sham affidavit rule to Andrews's statements regarding Tucker and that the food was a "reward."

Nevertheless, Andrews's recitation of what Herrera told him is hearsay, as Andrews attempts to use the statements to prove that Tucker had a problem

with Andrews (and therefore set him up to be assaulted) and Defendant provided Herrera with food items as a "reward" for assaulting Andrews.[5] A district court generally cannot consider inadmissible hearsay evidence on summary judgment. See Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999). But a district court may consider a hearsay statement on summary judgment "if the statement could be reduced to admissible evidence at trial or reduced to admissible form." Jones v. UPS Ground Freight, 683 F.3d 1283, 1294 (11th Cir. 2012).

> The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial. See Pritchard v. S. Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996) (noting that an affidavit "can be reduced to admissible form at trial" by calling the affiant as a witness). If, however, the declarant has given sworn testimony during the course of discovery that contradicts the hearsay statement, we may not consider the hearsay statement at the summary judgment phase. The possibility that the declarant might change his sworn deposition testimony and admit to the truth of the hearsay statement amounts

---

[5] Although Defendant did not specifically object to these statements as hearsay, the Court sua sponte raises it so that it does not consider inadmissible evidence when making its summary judgment ruling. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1294 n.37 (11th Cir. 2012) (noting that the opposing party did not properly raise a hearsay objection to a particular piece of evidence, but "whether the statement could be reduced to admissible form at trial . . . is a necessary condition to [a court's] consideration of hearsay evidence at summary judgment. If it were not, [the court] might well require that a trial be conducted based on evidence that the trier of fact never would hear.").

> only to "a suggestion that admissible evidence might
> be found in the future," which "is not enough to defeat
> a motion for summary judgment." <u>McMillian v.
> Johnson</u>, 88 F.3d 1573, 1584 (11th Cir. 1996).

<u>Jones</u>, 683 F.3d at 1294.

At Herrera's deposition, he initially stated that he did not remember speaking with Andrews when Andrews was placed in his cell, but then he explained that he remembered a conversation about Andrews wanting to "make a lawsuit" on an officer. Doc. 72-1 at 32-35. He further testified that he did not remember Sergeant Tucker. <u>Id.</u> at 27. Herrera's deposition testimony is rather vague and nonspecific and does not necessarily contradict the hearsay statement in Andrews's Declaration about Tucker. And there is no evidence to suggest that Herrera would be unavailable at trial. Thus, the Court will consider Andrews's testimony that Herrera asked Andrews why Tucker had a problem with him.

Regarding Andrews's statement in his Declaration that Herrera told him the food was a "reward," Herrera repeatedly testified at his deposition that Defendant did not provide him with impermissible food items the day after the alleged assault:

> Q. You said maybe he gave you a what? I'm sorry, I
> didn't understand.

21

A. You said if he gave me any, any food. Yes, he gave
me the food I was supposed to have. He don't try to buy
me, he don't try to touch me, he don't try to do nothing.

Q. Well, did, did Sergeant Ciccone ever give you food
from a vending machine?

A. I can't remember, no.

Q. I don't remember or is the answer no? Are you not
sure?

A. I'm not, can't remember.

Q. Okay. I want to be very clear. Do you, do you not
remember or are you saying no, he did not give food
from a vending machine?

A. No, he not give me no food.

. . . .

Q. During the call, I, you, my memory is that you said
that Sergeant Ciccone gave you food after the other
inmate was put in the cell with you the next morning.

. . . .

A. Yeah, he gave me the food, the food I was supposed
to have, not to try to buy me to, to do something to the
inmate.

. . . .

Q. Did Sergeant Ciccone give you food the next
morning?

A. Yeah, my breakfast.

Q. Okay. Okay. So to be clear, the inmate was put in the cell on May 16th, and the next morning, May 17th, 2021, Sergeant Ciccone gave you food for breakfast?

A. Yes. The breakfast I was supposed to have.

Q. Okay.

A. Breakfast, lunch, and dinner. That's the only thing they give me.

. . . .

Q. Okay. Did, and it was, it was Sergeant Ciccone who personally put the tray in the flap?

A. I don't tell you that. I can't remember that. I know an officer came and gave me my food and I got my food.

Q. Okay. So you're saying that an officer gave you food the next morning for breakfast with your tray?

A. Yes, sir.

Q. Okay. So I'm just trying to understand. Why did you say that Sergeant Ciccone gave you food the next morning for breakfast?

. . . .

[A.] I don't know if it was Sergeant or it was an officer. An officer gave me my - -

[Q.] I'm sorry. What did you say?

[A.] An officer gave me my food, the food I was supposed to be given, I was supposed to have.

23

Doc. 72-1 at 24, 47–49; <u>see</u> <u>id.</u> at 61 ("God is my witness, no officer paid me to hurt that inmate, . . . and no officer gave me no food that morning to, to do nothing to that inmate.").

Considering Herrera's deposition testimony that he did not receive any food he was not supposed to have and no officer gave him food to do anything to Andrews, the Court cannot assume that he would change his testimony at trial in conformity with the hearsay statement in Andrews's Declaration. Thus, the Court will not consider on summary judgment the portion of Andrews's Declaration where he states that Herrera told him the food was a "reward" for assaulting him.

Defendant also takes issue with Andrews's statement in his Declaration that "Defendant spoke with Herrera after the alleged attack." Reply at 2 (referring to Doc. 72-3 at 2). According to Defendant, before Andrews authored this Declaration, he "never alleged that Defendant spoke to Herrera when he allegedly dropped off the food items, let alone about the supposed hit." <u>Id.</u>

At the outset, the Court notes that although Andrews is testifying about Defendant's alleged statements, Defendant's statements do not qualify as hearsay. <u>See</u> Fed. R. Evid. 801(d)(2) (excluding from the definition of hearsay an opposing party's statement). As such, only the sham affidavit rule can potentially exclude Andrews's statement. At Andrews's deposition, Andrews

testified that Defendant provided Herrera food items after the assault, with a "nod[]" and a "wink[]," and Andrews could "<u>only assume and conclude</u> that that was paid off for - - for the assault." Doc. 83-1 at 24, 25 (emphasis added). The first time Andrews mentioned that he overheard Defendant ask Herrera about the hit and whether Andrews was hurt was in his summary judgment Declaration. While certainly fodder for cross examination, the Court finds these statements are not inherently inconsistent so as to warrant exclusion. "Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all." <u>Tippens</u>, 805 F.2d at 954. Such issues must be resolved by the trier of fact. <u>See</u> <u>id.</u> Thus, the Court declines to apply the sham affidavit rule to the portion of Andrews's Declaration regarding Defendant's alleged statements to Herrera the morning after the alleged assault.

Finally, "Defendant objects to [Andrews's] statement that Herrera told him that he had been instructed to assault [Andrews] as hearsay." Reply at 2 (citing Doc. 72-3 at 3–4). In his Declaration, Andrews avers: "Afterwards, Herrera acknowledged to me that the food items were partial payment for carrying out an assault on me and that he had been instructed to stab me, but that Herrera chose to sexually assault me instead." Doc. 72-3 at 3–4. Andrews

25

does not clarify who instructed Herrera to assault him, so on this record, this statement in Andrews's Declaration is double hearsay—Andrews is relaying what Herrera told him and Herrera was relaying that an unnamed individual instructed him to assault Andrews. Andrews relies on these statements to show that Herrera was allegedly instructed to assault him.

At Herrera's deposition, Herrera answered, "No, sir," to the question, "[D]id anyone ask you to do anything harmful to the person who was put in the cell with you?" Doc. 72-1 at 51; see id. at 61 ("God is my witness, no officer paid me to hurt that inmate, . . . I never cut that inmate, and no officer gave me no food that morning to, to do nothing to that inmate."). He also answered, "No, sir, never," to the question, "Since you've been in the prison system, has any officer ever offered you anything to take action against another inmate?" Id. at 44–45; see id. at 24 ("He [[Defendant]] don't try to buy me, he don't try to touch me, he don't try to do nothing."). Herrera further repeatedly testified at his deposition that he did not assault Andrews. See, e.g., Doc. 72-1 at 14 ("I never raped him, I never put a knife on him, he's just trying to get money out of nothing."). Thus, considering Herrera's deposition testimony, the Court will not consider on summary judgment Andrews's statement in his Declaration that Herrera told Andrews he was instructed to stab Andrews, but he raped him instead. Similarly, for the same reasons, the Court will not consider

Andrews's deposition testimony that Herrera told him he was "lucky . . . that's all he did, and that he was supposed to hit [Andrews] and that's it." Doc. 83-1 at 26.

## VI. Law and Conclusions

## A. Eighth Amendment Violation

According to Defendant, "[Andrews] has provided inconsistent statements [in his Amended Complaint and administrative grievances] about whether Herrera told Defendant he was on CMI when Defendant placed [Andrews] in the cell." Motion at 8. And he "has not provided any evidence that Defendant had actual knowledge of Herrera's CMI status." Reply at 6. Indeed, Herrera's Daily Record of Special Housing form showed Herrera was in administrative confinement—not close management. Id. at 11 (citing Doc. 45-4). Regardless, Defendant contends that "being a CMI inmate does not automatically mean that said inmate presents any risk of danger to other inmates, let alone a substantial risk of serious harm." Id. at 9. Further, Defendant argues that even taking as true Andrews's allegations that Defendant knew "that CMI inmates are supposed to be housed alone in a cell, . . . it does not follow that Defendant had knowledge that Herrera would present a substantial risk of serious harm to [Andrews]." Id. at 10. Defendant also contends that he was not responsible for Andrews's housing assignment;

instead, he simply placed Andrews into the cell based on other official's direction. See id. at 10–11.

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates," Farmer v. Brennan, 511 U.S. 825, 832 (1994), but this does not make them "guarantor[s] of [prisoners'] safety," Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga., 400 F.3d 1313, 1321 (11th Cir. 2005). As such, prison officials are not constitutionally liable for every inmate attack. Farmer, 511 U.S. at 832. Instead, it is "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate [that] violates the Eighth Amendment." Id. at 828 (citations omitted). The Eleventh Circuit has explained:

> To succeed on a failure-to-protect claim, a plaintiff must satisfy three elements. First, the plaintiff must show that [he] was "incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834. Second, the plaintiff must show that the "prison official [had] a sufficiently culpable state of mind," amounting to "deliberate indifference." Id. (internal quotation marks omitted). Third, and finally, the plaintiff must demonstrate causation—that the constitutional violation caused [his] injuries. Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014).

Cox v. Nobles, 15 F.4th 1350, 1357–58 (11th Cir. 2021) (citations modified).

"The first element of deliberate indifference—whether there was a substantial risk of serious harm—is assessed objectively and requires the

plaintiff to show conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety." Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019) (internal quotations and citation omitted).

> The second element—whether officials were deliberately indifferent to that risk—requires a plaintiff to prove both an objective and subjective component. Id. "The subjective component requires" the plaintiff to provide "evidence that the defendant officer actually (subjectively) knew of the risk to the plaintiff inmate." Nelson v. Tompkins, 89 F.4th 1289, 1297 (11th Cir. 2024), cert. denied sub nom. Sellers v. Nelson, 145 S. Ct. 178 (2024) (citing Mosley, 966 F.3d at 1270–71) (internal quotations omitted). "'This standard is one of subjective recklessness as used in the criminal law' and it is 'a difficult burden for a plaintiff to meet[.]'" Id. (quoting Farmer, 511 U.S. 825, 839–40; then quoting West v. Tillman, 496 F.3d 1321, 1327 (11th Cir. 2007)). The objective component requires the plaintiff show that the official "responded to the known risk in an unreasonable manner, in that he or she 'knew of ways to reduce the harm' but knowingly or recklessly declined to act." Marbury, 936 F.3d at 1233 (quoting Rodriguez, 508 F.3d at 620). [The third element requires the plaintiff to] show that the officer's failure to reasonably respond caused his or her injury. See id. In sum, to establish deliberate indifference, a plaintiff must show (1) that an official was subjectively aware of a (2) substantial risk of serious harm and (3) disregarded that known risk by not responding to it in an objectively reasonable manner that (4) caused plaintiff's injury. Caldwell, 748 F.3d at 1099; Rodriguez, 508 F.3d at 617.

Oliver v. Warden, Wilcox State Prison, No. 23-11968, 2025 WL 1178369, at *5 (11th Cir. Apr. 23, 2025); cf. Wade v. McDade, 106 F.4th 1251, 1253 (11th Cir.

2024) (clarifying "the standard for establishing liability on an Eighth Amendment deliberate-indifference claim").

Under this standard, "liability requires consciousness of a risk." <u>Farmer</u>, 511 U.S. at 840. The defendant prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837. As such, a plaintiff must point to evidence showing "the defendant prison official <u>actually knew</u> of a substantial risk of serious harm, not just that he <u>should have known</u>." <u>Wade</u>, 106 F.4th at 1257. A prison official cannot be held liable under the Eighth Amendment for not appreciating that a prisoner faced a substantial risk of serious harm, even if "the risk was obvious and a reasonable prison official would have noticed it." <u>Farmer</u>, 511 U.S. at 842; <u>see also</u> <u>id.</u> at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment.").

Here, Defendant has shown, by reference to the Declarations and exhibits in the record, that no genuine issues of material fact exist. Thus, the burden shifts to Andrews to show that there is a genuine issue for trial. Upon review of the record and considering the evidence in the light most favorable to Andrews, the Court finds that Andrews presents evidence showing a

genuine issue of material fact that precludes entry of summary judgment in Defendant's favor.

Initially, however, the Court finds that insofar as Andrews contends that Herrera's CMI status alone is sufficient to show that Defendant violated Andrews's rights by placing him in Herrera's cell, his claim fails. "Placement on CMI is not synonymous with an inmate being dangerous or violent towards other inmates." Doc. 45-6 at 1. Indeed, inmates may be placed on CMI for a variety of reasons, including "[c]reating or causing property damage in excess of $1,000"; [a]n escape or escape attempt"; and "trafficking in drugs[.]" Fla. Admin. Code R. 33-601.800(2)(a)(4)(f), (j), (l). Even though FDC policy states that "CMI is the most restrictive <u>single cell</u> housing level," Doc. 72-4 at 2 (emphasis added), a "generalized awareness of risk, . . . does not satisfy the subjective awareness requirement" for an Eighth Amendment deliberate indifference claim. <u>Carter v. Galloway</u>, 352 F.3d 1346, 1350 (11th Cir. 2003); <u>see</u> <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537 (11th Cir. 1990) (affirming the district court's grant of summary judgment in favor of prison officials when the plaintiff reported an unspecified "racial problem" in his shared cell).

Nevertheless, Andrews also contends that Defendant "either instructed or approved of the assault," suggesting that Defendant had knowledge of the alleged "hit." Response at 13. Andrews's theory appears to be based on the

31

following: Sergeant Tucker issued Andrews a disciplinary report which prompted Andrews's move to administrative confinement; Tucker had a problem with Andrews and arranged for Herrera to "hit" Andrews; Defendant placed Andrews in the cell with Herrera; and the following morning, Defendant provided food items to Herrera as a reward for the "hit." See Doc. 72-3 at 2 ("I concluded that I was set up for a hit by Officer Tucker who passed me to [Defendant] who placed me with Inmate Herrera because I filed a grievance on Ofcr. J. Manley for beating and gassing an inmate who was having a seizure."). The evidentiary materials show that on May 16, 2021, the institution completed the afternoon count procedures at 5:55 p.m. See Doc. 83-3 at 4. At approximately 6:10 p.m., Tucker observed Andrews being disorderly and issued a disciplinary report, which prompted Andrews's move to administrative confinement. See Doc. 45-1. At 6:30 p.m., medical staff evaluated Andrews for a pre-special housing physical. See Doc. 83-4 at 3. Sometime thereafter, Andrews was escorted to N-Dorm and placed inside a holding cell. See Doc. 83-1 at 11–12. At 6:56 p.m., Defendant arrived at the institution for his shift. See Doc. 83-5 at 1. He approached Andrews in the holding cell and asked him some questions. Doc. 83-1 at 12 ("And while I was inside the holding cell waiting to be classified, [Defendant] came and asked me questions . . . and told me I'll be - - I will be placed in a cell shortly, that I had

32

to be classified and then . . . I'll be escorted to a cell."). Subsequently, Defendant

returned to the holding cell and escorted Andrews to Herrera's cell. Id. at 14.

Andrews testifies in his Declaration that the morning after the assault,

he saw Defendant provide Herrera with food items and overheard Defendant

ask Herrera whether he "hit" Andrews and if Andrews was hurt. Doc. 72-3 at

2. Andrews further presents evidence that Herrera was placed on CMI 45 days

prior to Andrews being placed in administrative confinement (Doc. 72-5 at 1);

Defendant was responsible for conducting weekly reviews of the status of the

inmates housed in his dorm (Doc. 72-2 at 25); Defendant knew that inmates on

CMI should not be housed with inmates on administrative confinement (Doc.

72-2 at 14, 26–27); and prior to placing Andrews in Herrera's cell, Herrera told

Defendant that he was supposed to be housed alone and Defendant responded,

"I don't care" (Doc. 72-3 at 1–2). The Court recognizes that while a failure to

follow policy, standing alone, does not rise to the level of a constitutional

violation, the failure "may still be relevant to the extent that it shows

subjective awareness of a substantial risk." Bowen v. Warden Baldwin State

Prison, 826 F.3d 1312, 1324 n.27 (11th Cir. 2016). The violation of policy,

coupled with Andrews's testimony that he saw Defendant give Herrera

impermissible food items and ask Herrera whether he hit Andrews and if

Andrews was hurt, could lead a jury to find that Defendant had subjective

knowledge that Herrera was "paid" to assault Andrews and Defendant nevertheless placed Andrews in the cell with Herrera. Thus, viewing the evidence in the light most favorable to Andrews, the Court finds genuine issues of material fact exist that preclude entry of summary judgment, and Defendant's Motion is due to be denied in this regard.

## B. Qualified Immunity

Defendant argues that he "is entitled to [q]ualified [i]mmunity as he did not violate [Andrews's] constitutional rights, nor violate any 'clearly established law.'" Motion at 14. "Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As a result, the qualified immunity defense protects from suit "all but the plainly incompetent or those who knowingly violate the law." Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003) (internal quotations and citation omitted). Indeed, as "'[g]overnment officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were

lawful." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting <u>Marsh v. Butler Cnty., Ala.</u>, 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

"To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority." <u>Jones v. Fransen</u>, 857 F.3d 843, 851 (11th Cir. 2017). "The term 'discretionary authority' covers 'all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority.'" <u>Hinson v. Bias</u>, 927 F.3d 1103, 1116 (11th Cir. 2019) (quoting <u>Jordan v. Doe</u>, 38 F.3d 1559, 1566 (11th Cir. 1994)). If the official does so, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate using the two-prong test established by the Supreme Court in <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). In accordance with <u>Saucier</u>, the Court must ask whether the facts viewed in the light most favorable to the plaintiff "show the officer's conduct violated a constitutional right[.]" <u>Id.</u>; <u>see also</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 736 (2002); <u>Beshers v. Harrison</u>, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting <u>Scott v. Harris</u>, 550 U.S. 372, 377 (2007)). The court must also ask whether the right allegedly violated was clearly established at the time of the violation. <u>Hope</u>, 536 U.S. at 739; <u>Saucier</u>, 533 U.S. at 201; <u>Scott</u>, 550 U.S. at 377.

> A right may be clearly established . . . in one of three ways: (1) case law with indistinguishable facts clearly

> establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

Gilmore v. Georgia Dep't of Corr., 144 F.4th 1246, 1258 (11th Cir. 2025) (en banc) (internal quotation marks and citation omitted). The Court may consider these questions in whichever order it chooses, and qualified immunity will protect the defendant if the answer to either question is "no." Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009); Underwood, 11 F.4th at 1328. Notably, "[b]ecause § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018) (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)).

Here, Defendant was acting in his discretionary authority as a FDC correctional officer sergeant when he placed Andrews in Herrera's cell; thus, the burden shifts to Andrews to show Defendant violated a clearly established right. If a jury believes Andrews's version of events, then it could find that Defendant was deliberately indifferent by placing Andrews in a cell with Herrera who Defendant knew was "paid" to harm Andrews. And at the time of

the alleged assault, the law was clearly established that a defendant violates the Eighth Amendment if he has subjective knowledge that an inmate poses a substantial risk of serious harm to another inmate, yet the defendant fails to respond reasonably to that risk. See e.g., Caldwell, 748 F.3d at 1099–100. Moreover, if Defendant had subjective knowledge that Herrera was "paid" to assault Andrews and nevertheless placed Andrews in the cell with Herrera, in violation of prison policy, such action would be "so egregious" as to clearly violate the Eighth Amendment. Gilmore, 144 F.4th at 1258. Thus, the Court finds Defendant is not entitled to qualified immunity.

## C. Punitive Damages

Defendant argues that Andrews's request for punitive damages must be dismissed because it is statutorily barred. See Motion at 17–24. Section 3626(a)(1)(A) provides:

> (1) Prospective relief. – (A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

37

18 U.S.C. § 3626(a)(1)(A). Punitive damages are considered "prospective relief" under § 3626. See Johnson v. Breeden, 280 F.3d 1308, 1325 (11th Cir. 2002) (holding "punitive damages are prospective relief"), abrogated on other grounds by Kingsley v. Hendrickson, 576 U.S. 389, 395 (2015). Nevertheless, Defendant's argument that punitive damages, as "prospective relief" under § 3626, are precluded in prisoner civil rights actions is misguided.

While the Court is unaware of an Eleventh Circuit case that has addressed Defendant's specific argument here, the Court cannot disregard the Eleventh Circuit's long-standing recognition that punitive damages are available in prisoner civil rights actions. Indeed, the Eleventh Circuit has held that 42 U.S.C. § 1997e(e) permits claims for punitive damages for § 1983 claims without a physical injury requirement. Hoever v. Marks, 993 F.3d 1353, 1364 (11th Cir. 2021). And it has held "[p]unitive damages are appropriate in § 1983 cases 'where a defendant's conduct is motivated by evil intent or involves callous or reckless indifference to federally protected rights." Barnett v. MacArthur, 715 F. App'x 894, 905 (11th Cir. 2017). Notably, the Eleventh Circuit Civil Pattern Jury Instructions on § 1983 damages include an instruction on awarding punitive damages. See Eleventh Circuit Pattern Jury Instruction, Civil Cases, Civil Rights—42 U.S.C. § 1983 Claims—Damages § 5.13.

The Court also finds persuasive other district court decisions explicitly finding that § 3626(a)(1)(A) does not preclude an award of punitive damages in prisoner civil cases. <u>See, e.g.</u>, <u>Wright v. Ramos</u>, No. 3:23CV15676/LAC/ZCB, 2025 WL 542313, at *6 (N.D. Fla. Jan. 14, 2025), <u>report and recommendation adopted</u>, 2025 WL 523845 (N.D. Fla. Feb. 18, 2025) (collecting cases); <u>Douglas v. Byunghak Jin</u>, No. 11-0350, 2014 WL 1117934, at *4–5 (W.D. Penn. Mar. 20, 2014) (reasoning that if Congress "intended to abolish punitive damages in all prisoner litigation under the PLRA, it would have done so directly, and in much plainer terms"). Thus, the Court finds that § 3626 does not preclude a request for punitive damages in this § 1983 action, and Defendant's Motion is due to be denied on this issue.

Accordingly, it is

**ORDERED:**

1.    Defendant's Motion for Summary Judgment (Doc. 45) is **DENIED**.

2.    This case is referred to the Honorable Samuel Horovitz, United States Magistrate Judge, to conduct a settlement conference. No later than **September 12, 2025**, the parties shall confer and contact Judge Horovitz's chambers to schedule the conference. The parties are encouraged to engage in good-faith settlement discussions prior to the conference. If they are able to

resolve the case privately, they shall immediately notify the Court. <u>See</u> Local Rule 3.09(a), United States District Court, Middle District of Florida.

      **DONE AND ORDERED** at Jacksonville, Florida, this 29th day of August, 2025.

MARCIA MORALES HOWARD
United States District Judge

JAX-3 8/26
c:
Counsel of record